2004 WY 113

**Nedra RONEY, a/k/a Nedra Roney Wentland, Appellant (Defendant),**

v.

**B.B.C. CORPORATION, a Wyoming corporation, d/b/a Coldwell Banker/The Real Estate Co. in Jackson, Wyoming, Appellee (Plaintiff).**

No. 03–247.

Supreme Court of Wyoming.

Sept. 24, 2004.

Representing Appellant: Frank Hess and Paul E. D'Amours of Hess Carlman & D'Amours, LLC, Jackson, WY. Argument by Mr. D'Amours.

Representing Appellee: Weston W. Reeves and Timothy W. Miller of Reeves & Miller, Casper, WY. Argument by Mr. Reeves.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] This is an appeal from the district court judgment ruling that appellant Nedra Dee Roney (Roney) is liable under a listing agreement for the payment of a commission, plus prejudgment interest and attorneys fees to appellee B.B.C. Corporation, doing business as Coldwell Banker/The Real Estate Company in Jackson, Wyoming (BBC). We affirm.

### ISSUES

[¶ 2] Roney sets forth the following issues on appeal:

I. Did the trial court err in concluding that Appellant and Appellee made an express contract, the terms of which were contained in the exclusive listing agreement?

II. Did the trial court err in finding that the brokerage disclosure received by Appellant was in substantial compliance with Wyoming Statute § 33–28–306?

III. Did the trial court err in finding that the release of Appellant from the listing agreement by John Gould was not effective to release Appellee's interest in the listing contract?

IV. Did the trial court err in failing to find that Appellee was the first to breach the contract?

V. Did the trial court err in awarding Appellee the full 7% commission?

VI. Did the trial court err in awarding attorneys fees?

BBC phrases the issues on appeal as:

1. Whether the trial court clearly erred in finding appellant liable for a commission based on undisputed evidence admitted at trial without objection.

2. Whether appellant can use technical defects in disclosures approved by her real estate portfolio manager to avoid paying the commission she owes appellee.

### FACTS

[¶ 3] Roney is a sophisticated owner of real estate worth millions of dollars located in California, Idaho, Nevada, Utah, Wyoming, and the Cayman Islands. John Gould (Gould), a California licensed real estate agent working for Coldwell Banker/Beverly Hills North (CB/BHN), worked with Roney in the real estate arena for over ten years. On March 22, 2001, Roney and Gould entered into an agreement making Gould her real estate portfolio manager, wherein Gould was authorized to identify and consult with local area brokers to co-list Roney's properties. Roney retained signatory authority for any transactions.

[¶ 4] On January 26, 2001, Roney and Gould executed California listing agreements for three separate properties located in Teton and Fremont Counties in Wyoming, commonly known as the Pine Meadows, Smoky Hollow–Mosquito Creek, and Lucky Dog properties. The listing prices were $5.9 million, $12.5 million, and $650,000, respectively. On this same date, Roney and Gould signed a California real estate agency disclosure form. Later, on February 9, 2001, Roney and Gould executed another California listing agreement concerning a property located in Bonneville County, Idaho, commonly known as the Pine Creek Ranch for the listing price of $2.5 million. Subsequently still, on March 22, 2001, Roney and Gould executed a Cali-

fornia listing agreement concerning a separate property located within the downtown area of Jackson, Wyoming ("Downtown property") for the listing price of $2.2 million. The latter transaction is the subject of this action.

[¶ 5] Each of the listing agreements provided that Roney pay a seven percent commission on the listing price in the event she withdrew the properties from the market without prior consent. The agreements also stated that Gould would locate a local broker to co-list the properties and that the local laws, rules, and regulations wherein each respective property was located would prevail.

[¶ 6] In early 2001, Gould and Roney's attorney, Tom Branch, met with members of BBC, including Cyril Richard (Richard), a broker licensed in both Idaho and Wyoming, to find an acceptable local real estate broker to list the properties. Ultimately, BBC was formally retained, and Richard executed each of the listing agreements on behalf of BBC. Specifically with respect to the listing agreement concerning the Downtown property, Gould faxed the listing agreement that had already been signed by Roney and Gould and a co-listing agreement as between Gould and BBC to Richard on March 27, 2001. Richard signed the listing agreement and co-listing agreement and returned the co-listing agreement to Gould.[1]

[¶ 7] BBC extensively marketed each of the properties for sale. Through BBC's efforts, the Pinecreek Ranch property located in Idaho sold in June 2001. Upon the closing of that sale, Roney identified BBC as the listing broker, and BBC received payment of its commission. On June 20, 2001, Roney asked Gould if she could withdraw the Wyoming properties from the market and be released from the listing agreements. Gould agreed and advised Roney of such releases on his part, but warned that his release may not be binding on BBC. Gould then requested that BBC release Roney from the listing agreements. In particular, Gould explained that Roney often varied her position with

respect to sales of her real estate portfolio and that because she was a very important client, he let her do what she wanted in an effort to retain her business. BBC refused to release Roney outright from the listing agreements, but stated that it would consider releasing the listing agreements concerning any transaction wherein Roney traded property with her brother, as long as Roney paid for BBC's expenses. Ultimately, BBC formally agreed to accept payment of its expenses from Roney and released the listing agreement concerning the Smoky Hollow–Mosquito Creek property that Roney traded with her brother for other property.

[¶ 8] On September 6, 2001, the Lucky Dog property sold through BBC's efforts, and BBC received a commission from the sale. Nevertheless, Roney withdrew the Downtown property from the market and, four months later, listed the property for sale with a different Jackson broker at the same listing price. On April 9, 2002, BBC filed a complaint against Roney alleging that Roney had breached the listing agreement on the Downtown property. After trial, the district court ordered Roney to pay BBC the seven percent commission on the listing price, interest, and attorney fees called for under the listing agreement. This appeal followed.

### STANDARD OF REVIEW

[¶ 9] A trial was held before the district court, with the district court issuing specific findings of fact and conclusions of law. We recently revisited the standard of review applicable in such case in *Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Prod. Co.*, 2003 WY 139, ¶ 6, 78 P.3d 679, ¶ 6 (Wyo.2003) (quoting *Ahearn v. Hollon*, 2002 WY 125, ¶ 15, 53 P.3d 87, ¶ 15 (Wyo.2002)):

> The purpose of specific findings of fact is to inform the appellate court of the underlying facts supporting the trial court's conclusions of law and disposition of the issues. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993). While

---

1. Co-listing agreements were also executed between CB/BHN and BBC for each of the other properties.

the findings of fact made by a trial court are presumptively correct, we examine all of the properly admissible evidence in the record. Because this court does not weigh the evidence de novo, findings may not be set aside because we would have reached a different result. Rather, the appellant has the burden of persuading the appellate court that the finding is erroneous. *Id.* See also *Maycock v. Maycock*, 2001 WY 103, ¶ 11, 33 P.3d 1114, ¶ 11 (Wyo.2001). Findings of fact are not set aside unless inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence. The definitive test of when a finding of fact is clearly erroneous is when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. A determination that a finding is against the great weight of the evidence means that a finding will be set aside even if supported by substantial evidence. *Id.* See also *Mathis v. Wendling*, 962 P.2d 160, 163 (Wyo.1998). Conclusions of law made by the trial court are not binding on this court and are reviewed de novo. *Maycock*, ¶ 12.

## DISCUSSION

### Breach of Contract Issues

[¶ 10] Initially, Roney asserts that the trial court erred in concluding that the listing agreement constituted an express contract between Roney and BBC. Roney claims that she and Gould were the only parties particularly identified within the listing agreement, and even though BBC signed the agreement, it was not a party to the agreement. Roney contends that the agreement unambiguously sets forth Gould and herself as parties to the agreement, and it was therefore improper for the district court to rely upon extrinsic evidence in ultimately concluding that BBC was a party to the agreement.

> In contract litigation, when the terms of the agreement are unambiguous, the interpretation is a question of law.... *Examination Management Services, Inc. v. Kirschbaum*, 927 P.2d 686, 689 (Wyo. 1996); *Union Pacific Resources Co. v. Texaco, Inc.*, 882 P.2d 212, 218–19 (Wyo. 1994). Whether a contract is ambiguous is a question of law for the reviewing court. *Prudential Preferred Properties v. J and J Ventures, Inc.*, 859 P.2d 1267, 1271 (Wyo.1993). We review questions of law de novo without affording deference to the decision of the district court. *Hermreck v. United Parcel Service, Inc.*, 938 P.2d 863, 866 (Wyo.1997); *Griess v. Office of the Atty. Gen., Div. of Criminal Investigation*, 932 P.2d 734, 736 (Wyo. 1997).
>
> According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.*, 882 P.2d at 220; *Prudential Preferred Properties*, 859 P.2d at 1271. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo. 1996); *Prudential Preferred Properties*, 859 P.2d at 1271.

*Amoco Prod. Co. v. EM Nominee Partnership Co.*, 2 P.3d 534, 540 (Wyo.2000).

*Double Eagle Petroleum & Min. Corp.*, at ¶ 7.

[¶ 11] Each of the listing agreements, including the listing agreement involving the Downtown property, specifies only the names of Roney and Gould within the body of the contract. However, Richard signed each of the listing agreements on behalf of BBC at the bottom of those agreements. The listing agreements also provided, in applicable part:

1. EXCLUSIVE AUTHORIZATION: Nedra Roney ("Owner") hereby employs and grants Coldwell Banker—John Gould ("Broker") the exclusive and irrevocable right, commencing on 3–22–01 and expir-

ing at 11:59 p.m. on 3–21–03 ("Listing Period") to sell: [the Downtown property].

2. TERMS OF SALE:

A. LIST PRICE: The listing price shall be [Two Million Two Hundred Thousand Dollars].

. . .

C. ADDITIONAL TERMS: [Gould] to identify local area Broker to co-list and market property. Wyoming laws, rules & regulations prevail.

. . .

5. COMPENSATION TO BROKER:

. . .

A. Owner agrees to pay to Broker as compensation for services irrespective of agency relationship(s) seven percent of the listing price . . . as follows:

. . .

(3) If, without Broker's prior written consent, the Property is (i) withdrawn from market . . . during the Listing Period, or any extension.

[¶ 12] Upon our review, we agree with Roney that the language used within the Downtown property listing agreement is clear and unambiguous. However, we hold that BBC was a party to the agreement. Specifically, the agreement states that Gould was to identify a local broker to co-list the Downtown property. Thus, the agreement explicitly provides for a third party to be involved. There is little doubt that Roney and Gould contemplated that a co-listing broker would need to be retained to market and sell the Downtown property. Moreover, the agreement patently states that seven percent of the listing price would be due as a commission should Roney withdraw the Downtown property from the market during the listing period without consent.

[¶ 13] In this case, it is undisputed that Gould and Roney's attorney met with BBC in an effort to find a local real estate broker to list the Downtown property. Ultimately, BBC was formally retained for such services when Richard signed the listing agreement on behalf of BBC. By providing the listing agreement to BBC, Roney and Gould indicated their intent to include BBC as co-listing broker and that BBC be a party to that agreement. Thereafter, Roney withdrew the Downtown property from the market during the listing period without full consent and, four months later, listed the property with a different Jackson broker for sale at the same listing price. Roney's actions triggered the requirement that she pay BBC the specified commission and all other related expenses enumerated within the listing agreement. Even if we assume that the listing agreement's designation of Roney and Gould as the parties within the body of the agreement coupled with BBC's signature at the bottom of the listing agreement renders the listing agreement ambiguous, we would reach the same result. The surrounding circumstances mandate such a conclusion.

[¶ 14] The parties entered into listing agreements involving the sale of five separate properties. Each of these listing agreements contained the same terms. Most importantly, these agreements called for the involvement of a co-listing broker where the properties were located. Again, as indicated under these provisos, BBC was retained in such capacity. Furthermore, when Gould was questioned at trial, the following colloquy transpired:

Q. You understood from the beginning, didn't you, that you couldn't practice your profession as a real estate sales person in Wyoming?

A. That's correct.

Q. And so you did not solicit any offers?

A. No, I did not.

Q. On the Wyoming property you made no contacts with any other realtors looking for offers or advertising the property, did you?

A. In my California market and on my website the properties were there, but not in Wyoming, no.

Q. Okay. You were careful not to do that in Wyoming because you recognized that there was a criminal penalty if you acted as—.

A. My license is in California, not in Wyoming. That's why Mr. Richard was brought in.

Q. But surely didn't you as the—as the longtime advisor of Ms. Roney you wanted

her to be represented in Wyoming by a competent and reliable real estate professional?

A. I did.

Q. Somebody who could do all of the things that a broker and sales person does on the ground here that you could not do?

A. Correct.

Q. And after checking them out your choice for that service was the [BBC]?

A. That's correct.

Each of the listing agreements stated explicitly that the local laws, rules and regulations wherein each respective property was located would prevail. Moreover, Roney and Gould entered into an exclusive agreement wherein Gould was authorized to identify and consult with local area brokers to co-list properties owned by Roney.

[¶ 15] The Pinecreek Ranch property located in Idaho sold in June 2001, as a result of the work performed by BBC. Upon the closing of that sale, Roney identified BBC as the listing broker and paid BBC its commission. Similarly, on September 6, 2001, the Lucky Dog property sold through BBC's efforts. BBC also received a commission from this sale. These transactions evidence that Roney understood and intended that BBC formally act as the co-listing broker under each of the listing agreements, including the Downtown property listing agreement.

[¶ 16] On June 20, 2001, Roney asked Gould if she could withdraw the properties located in Wyoming from the market and be released from the listing agreements. Gould agreed to release his portion of the listing agreements, but warned that his release may not be binding on BBC. Gould then requested that BBC release Roney from the listing agreements. Gould advised BBC that Roney often changed her mind concerning the sale of her real estate and that because she was a very important client, he let her do what she wanted to retain her business. Gould's actions show that he believed that BBC was also required to formally release the listing agreements. Roney also apparently believed this to be the case because she ultimately sought and formally obtained BBC's formal agreement to accept payment of its expenses

in exchange for releasing Roney from the listing agreement concerning the Smoky Hollow–Mosquito Creek property. In fact, under this agreement, Roney explicitly stated that if BBC agreed to the release, the parties would move forward with a relationship that would benefit both parties and resolve any hard feelings. Such a statement infers that Roney understood that she was contractually obligated to BBC under the Downtown property listing agreement.

[¶ 17] Finally, Roney is the owner of many pieces of real estate worth millions of dollars and often engages in real estate transactions. Throughout the applicable period, Roney utilized the services of Gould, a California licensed real estate agent. Roney had previously worked with Gould in the real estate area for over ten years, and Roney formally made Gould her real estate portfolio manager on March 22, 2001. Roney's attorney was also used to locate a local real estate broker to list the Downtown property as required under the listing agreement. Under the evidence put forth, it was well established that Roney and Gould intended to include BBC as a party to the Downtown property listing agreement. It was essential to enlist the services of a local broker under the contract in order to lawfully market the property for sale in Wyoming. BBC was the chosen local broker and became a party to the listing agreement when Richard signed the agreement on behalf of BBC.

[¶ 18] In a related contention, Roney asserts that Gould's release of the Downtown property listing agreement excused her from any obligations under the contract. However, for the same reasons stated above, we are not persuaded by Roney's argument. BBC was a party to the listing agreement, and its release was also required to discharge Roney's responsibilities under the agreement.

[¶ 19] In a different argument, Roney asserts that the district court impliedly ruled that an enforceable oral contract existed between the parties when it recited the *Van Ewing v. Hladky Const., Inc.*, 2002 WY 95, ¶ 11, 48 P.3d 1086, ¶ 11 (Wyo.2002), case in its findings of fact and conclusions of law. Upon our review, we conclude that this argu-

ment is unpersuasive, as we conclude that the district court's order is clear that this was not the court's finding. In any event, we hold that an explicit written contract existed between the parties, and we therefore need not address Roney's arguments regarding the formation of an oral contract.

[¶ 20] Roney next argues that even if there was a valid listing agreement between herself and BBC, BBC first breached the agreement by failing to offer a 3.5 percent commission when BBC listed the property for sale. According to Roney, the co-listing agreement entered into between Gould and BBC constitutes an integral addendum to the listing agreement concerning the Downtown property. She therefore asserts that the terms of the co-listing agreement must be incorporated into the listing agreement. Thus, because the co-listing agreement specified that at least a 3.5 percent cooperating commission would be offered and BBC only offered a 3 percent commission when it listed the property for sale, BBC materially breached the listing agreement precluding BBC from enforcing the contract against Roney.

[¶ 21] We do not agree that the co-listing agreement must be considered an addendum to the listing agreement. To the contrary, while both deal with the sale of the Downtown property, they address separate and distinct subject matters and were entered into by different parties, namely, Roney, Gould, and BBC with respect to the listing agreement and Gould and BBC with respect to the co-listing agreement. The breach of another contract not between the same parties is not a defense. *Peters Grazing Ass'n v. Legerski*, 544 P.2d 449, 458 (Wyo.1975). Further, even if BBC breached the contract as alleged by Roney, such action does not amount to a material breach of the listing agreement. As cited by Roney, "[t]o be material, the breach [of contract] must be a failure to do something so substantial and fundamental as to go to the root, essence, or substance of the contract, and defeat the object or purpose of the parties in entering into the contract." 17B C.J.S., *Contracts* § 507 (1999) (footnotes omitted). BBC's actions do not rise to the level of a material breach of the contract. Roney's contention that BBC's failure to offer a higher incentive may have prevented the property from being sold is purely speculative.

[¶ 22] Lastly, Roney argues that the district court wrongfully awarded BBC the full seven percent commission stated within the listing agreement. The listing agreement clearly set forth that Roney owed seven percent of the listing price as a commission should Roney withdraw the Downtown property from the market without consent during the listing period. Any potential dispute between Gould and BBC concerning the division of such amount under the co-listing agreement is not before this court.

### Disclosure

[¶ 23] Roney also argues that the trial court erred when it found that BBC's brokerage disclosures substantially complied with Wyo. Stat. Ann. § 33–28–306 (LexisNexis 2003). In essence, Roney asserts that because the statute requires disclosure as a condition precedent to the formation of a valid listing agreement and BBC provided Roney with no such disclosure, no valid listing agreement between Roney and BBC existed as a matter of law.

[¶ 24] Wyo. Stat. Ann. § 33–28–306 (LexisNexis 2003), provides:

(a) Prior to engaging in any discussion or arrangement incidental to a sale, purchase, exchange or lease, and prior to entering into any written agreement, with a buyer or seller, a broker shall make a written disclosure of applicable brokerage relationships which must contain at a minimum the following:

(i) A description of all the different brokerage relationships allowed by this article and a statement that the commission for different relationships is negotiable;

(ii) An explanation of the duties and obligations owed under each such relationship;

(iii) A conspicuous statement of duties and obligations owed by an agent but which are not owed by an intermediary;

(iv) A statement that any established relationship cannot be modified without the written consent of the buyer or seller and that the buyer or seller may, but is not required to, negotiate different commission fees as a condition of consenting to a change in relationship; and

(v) A statement that an intermediary is not an agent or advocate for any party and has only the obligations set forth in W.S. 33–28–305.

(b) The written disclosure shall contain a signature line for the buyer or seller to acknowledge receipt of the disclosure. The disclosure and acknowledgment, by itself, shall not constitute a contract or agreement with the broker. Until the buyer or seller executes such acknowledgment, no representation agreement shall be executed or valid.

. . .

(d) Disclosures made in accordance with this article shall be sufficient to disclose brokerage relationships to the parties to the transaction and to the public.

[¶ 25]   In this case, it is true that no brokerage disclosure statement was provided by BBC to Roney. However, Gould presented Roney with a written disclosure regarding the listing agreements involving the Pine Meadows, Smoky Hollow–Mosquito Creek, and Lucky Dog properties. This disclosure contained a description of the different brokerage relationships in substantial compliance with § 33–28–306. Moreover, Gould advised Richard that the single California disclosure form Gould presented to Roney concerning the Pine Meadows, Smoky Hollow–Mosquito Creek, and Lucky Dog properties would suffice for all the listings. In addition, as required under the statute, each of the listing agreements, including that for the Downtown property, advised that the compensation for different relationships was negotiable. These listing agreements also contain disclosures of a broker's responsibilities and of agency relationships. Further, additional advisories were given in Exhibit 1 appended to the listing agreement concerning the Pine Meadows property. We also note that Roney often entered into transactions concerning her many pieces of real estate and used Gould's services during these transactions. Indeed, Roney formally appointed Gould to act as her exclusive agent to identify and consult with local area brokers to co-list properties owned by her.

[¶ 26]   Looking at each of the disclosures given and the underlying circumstances, we conclude, as did the district court, that the disclosures substantially complied with § 33–28–306. Furthermore, while Roney tries to argue that distinctions exist between the California disclosure given and what is required under Wyoming law, we note that the listing agreement explicitly provides that commission would be required to be paid when an unauthorized withdrawal of the property was made *"irrespective of agency relationship(s)."*

[¶ 27]   We have expressed on many occasions that public policy does not favor the forfeiture of contract rights. In *Wyoming Realty Co. v. Cook*, 872 P.2d 551, 554 (Wyo. 1994) (quoting *Battlefield, Inc. v. Neely*, 656 P.2d 1154, 1157 (Wyo.1983)), we reiterated:

> Courts do not like to aid litigants in avoiding their contractual obligations by joining in their games of hide-and-seek behind statutory technicalities—especially is this so where the other party has performed and the party looking to avoid the contract has reaped all the benefits of the performance. We will not aid and abet such efforts if we can possibly avoid it.

*See also Gray v. Stratton Real Estate*, 2001 WY 125, ¶¶ 9–10, 36 P.3d 1127, ¶¶ 9–10 (Wyo. 2001). As in the above-cited cases, we decline to allow Roney to avoid her contractual obligations.

### Damages

[¶ 28]   Lastly, in a very summary argument, Roney asserts that if this court finds that BBC was not a party to the Downtown property listing agreement, the district court improperly awarded BBC its attorney fees and costs in this case. Given that this court holds that BBC was a party to that contract, Roney's arguments regarding damages do not apply.

## CONCLUSION

[¶ 29]   We hold the district court did not err in finding that the listing agreement constituted an enforceable contract, that Roney breached its terms by withdrawing the Downtown property from BBC during the applicable listing period without consent and, consequently, that BBC was entitled to the commission, interest, and attorney fees assessed.

[¶ 30]   Affirmed.