2009 WY 150

**Dean GROMMET, Malinda Grommet, husband and wife, and Michelle Costi, Appellants (Defendants),**

v.

**Blair NEWMAN, d/b/a Newman Realty, Appellee (Plaintiff).**

**Blair Newman, d/b/a Newman Realty, Appellant (Plaintiff),**

v.

**Dean Grommet, Malinda Grommet, husband and wife, and Michelle Costi, Appellees (Defendants).**

Nos. S–08–0148, S–08–0149.

Supreme Court of Wyoming.

Dec. 10, 2009.

Representing Dean and Malinda Grommet and Michelle Costi: Patrick J. Murphy of Williams, Porter, Day & Neville, P.C., Casper, Wyoming; and Thomas S. Peters of Peters Associates, LLC, Teton Village, Wyoming. Argument presented by Mr. Murphy.

Representing Blair Newman: Michael E. Warren of Sawyer & Warren, P.C., Torrington, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1]   Blair Newman, dba Newman Realty (Newman), initiated this litigation by filing his complaint in the district court on June 19, 2006. Newman asserted that he was owed a real estate commission by Dean Grommet [Grommet], in accordance with the terms of a real estate listing agreement between them.[1]

---

1.  In both of these cases "Grommet" will be used to refer to Dean Grommet, Malinda Grommet (Dean Grommet's wife), and Michelle Costi (Dean Grommet's sister) collectively. In a few instances, for purposes of clarity, we will refer to "Dean Grommet" as an individual where circumstances necessitate it. These parties owned the ranch, the sale of which is at the heart of this controversy, in a form of joint ownership. However, Dean Grommet was at all times the only person who appears to have exercised authority over the sales process and it simplifies the discussion of the facts and issues to refer to this group of parties simply as "Grommet."

Newman also sought an award of attorney's fees from Grommet as provided for in the listing agreement, if he was successful in his action. It enhances the clarity of our opinion to note at this juncture that the real estate sale at issue here affected a large ranch property owned by Grommet, and that the Wyoming National Guard (WNG) was the purchaser. That ranch was contiguous with existing WNG properties near Guernsey.

[¶ 2] On April 8, 2008, the district court entered its judgment awarding Newman damages in the amount of $537,000.00, plus prejudgment interest of 7% per annum from July 10, 2006, until the judgment was entered, as well as post judgment interest of 10% per annum from the date the judgment was entered until it was paid in full. The district court declined to award attorney's fees in Newman's favor. In Case No. S–08–0148, we will affirm the district court's judgment with respect to the damages awarded to Newman. In Case No. S–08–0149, we reverse the district court's judgment insofar as it declined to award attorney's fees to Newman and we remand to the district court with directions that it award reasonable attorney's fees to Newman in accordance with the contract.

## ISSUES

[¶ 3] In Case No. S–08–0148, Grommet raises these issues:

A. Whether the district court erred when it found that [Grommet] acted in bad faith toward [Newman] where [Grommet] acted in full accordance with the parties' real estate contract.

B. Whether the district court denied [Grommet] procedural due process when it imposed liability for breach of the implied covenant of good faith and fair dealing after ruling, during trial, that this case was not being tried on the covenant of good faith and fair dealing.

C. Whether the district court erred when it ruled that the parties' real estate contract was not void and unenforceable for

[Newman's] failure to provide and obtain the statutory brokerage disclosures.

D. Whether [Newman] committed fraud on [Grommet] and the Wyoming Real Estate Commission with his redacted 2003 disclosure statement.

E. Whether the district court erred when it failed to award [Grommet] any damages for [Newman's] wrongful filing of a *Lis Pendens* against [Grommet's] ranch.

F. Whether the district court erred in finding that [Newman] did not breach his fiduciary duties to [Grommet] where, as here, the undisputed evidence showed otherwise.

G. Whether the district court erred when it rejected [Grommet's] counterclaims, and whether [Grommet is] lawfully entitled to compensatory damages and [his] attorney's fees under the real estate contract and the common law.

Newman essentially conforms his statement of the issues to that articulated by Grommet for this appeal.

[¶ 4] In his reply brief, [Grommet] asserted that these new issues were raised by Newman in his brief for this case:

A. Newman makes numerous misrepresentations and material omissions in his brief which must be corrected to avoid injustice.

B. Newman's misstatements, in his brief, as to the reasons he failed to obtain a signed brokerage disclosure from [Grommet] in August 2005, warrant reversal and entry of judgment for [Grommet].

C. Sellers who honor the terms of their express contracts do not act in bad faith.

1. [Grommet was] permitted and authorized by [his] CONTRACT with Newman to hire subsequent brokers after expiration of Newman's listing period.

2. Newman cannot link [Grommet's] alleged prevention of Newman's performance to any of the proscribed conduct in *Havens*.[2]

3. Newman did not prove he was "plainly or evidently approaching success

---

**2.** *Havens v. Irvine,* 61 Wyo. 309, 157 P.2d 570 (1945); *rehearing denied,* 61 Wyo. 309, 159 P.2d 366 (1945).

in his undertaking" when Grommet terminated Newman's services in late March 2006.

4. [Grommet's] desire to realize $8.5 [million] for [his] property—instead of $7.7 [million]—after Newman's listing period expired is never bad faith.

5. The district court's finding of bad faith imposes liability in the absence of any objective standard, or criteria, of bad faith.

D. None of the evidence supports a finding of an implied, extended contract after the 2/12/06 expiration of Newman's listing period.

E. The general and special Statutes of Fraud bar any commission for Newman.

F. Newman's receipt of [Grommet's] 3/25/06 letter on 3/30/06 does not affect or invalidate the 3/29/06 listing agreement of Brockman and [Grommet].

G. The district court's revival of Newman's bad faith claim at trial, and the district court's imposition of bad faith liability under *Scherer* [3] following trial, violated [Grommet's] right to due process.

H. Newman's other misstatements must be corrected.

[¶ 5] We will set out the issues in case No. S-08-0149 in a separate section of this opinion.

## FACTS AND PROCEEDINGS

[¶ 6] At the outset we note that Grommet's appeal hinges on his contention that the district court resolved the issues in this case on "perceived equities," rather than the four corners of the governing contract. He also contends that the district court erred in applying this Court's decision in *Scherer Construction, LLC v. Hedquist Construction, Inc.*, 2001 WY 23, 18 P.3d 645 (2001) rather than *Havens v. Irvine*, 61 Wyo. 309, 157 P.2d 570 (1945).

[¶ 7] Newman was a real estate broker who operated his principal office in Goshen County. He sold real estate throughout Wyoming, including Platte County. Grommet owned real estate near Guernsey known as the Gray Rocks Ranch. In 1992, Grommet purchased the Gray Rocks Ranch for approximately $1,050,000.00, with Newman acting as the listing agent. Grommet listed that ranch for sale with Newman as the real estate broker (who was working for Garver Realty at that time) in 1998, for $4.9 million at a commission of 8%. Portions of the ranch were sold and various land purchases and trades were made in the intervening years which enlarged the ranch and made it contiguous to Camp Guernsey. Grommet worked with Newman in approximately 21 real estate transactions over the years. The ranch was taken off the market for a time, but Grommet again listed the ranch with Newman in December of 2003, by way of an exclusive listing contract that was to run through December of 2005. The listing price was $7.3 million for the ranch as a whole, but if the ranch were sold in two distinct parcels, the total would be $7.7 million. The final listing agreement between these parties supplanted that mentioned immediately above and was dated August 12, 2005, and was to expire on February 12, 2006. That contract set a price of $7.7 million for the entire ranch. Newman's commission was to be 6%, and he was to receive a $75,000 bonus if he sold the ranch for a full-price offer.

[¶ 8] The evidence was that Newman advertised the ranch extensively and spent considerable money doing so. He contacted persons, entities, and other brokers. He showed the property on multiple occasions. Newman also distributed and otherwise made available literature regarding the ranch.

[¶ 9] In the fall of 2004, Colonel Steve Mount of the Wyoming National Guard saw some of Newman's advertising literature regarding the Gray Rocks Ranch. Colonel Mount was immediately interested in the property since the property was adjacent to the WNG's existing lands and WNG wanted to expand Camp Guernsey. At that time, the asking price was $7.3 million. Newman showed the property to several members of the WNG. Major General Ed Wright, the Adjutant General of the Wyoming National Guard, met with the military affairs committee of the Wyoming State Legislature regarding funding to purchase the ranch. In

3. *Scherer Construction, LLC v. Hedquist Construction,* 2001 WY 23, 18 P.3d 645 (2001).

July of 2005, a story appeared in the *Casper Star Tribune* that stated that the WNG wanted an appropriation of $8 million, which was to be used, in part to purchase the Gray Rocks Ranch. The WNG's intent and ability to purchase the ranch was contingent upon the legislature's appropriating the funds and the WNG obtaining an appraisal at least equal to the eventual purchase price. On August 12, 2005, when it became known that the WNG was seeking an $8 million appropriation, Grommet had Newman write a letter to the WNG stating that the new listing price was $7.7 million for the entire ranch. On September 22, 2005, WNG wrote back and stated that it was very interested in purchasing the property, but it had to wait for an appropriation from the legislature.

[¶ 10] On September 27, 2005, General Wright met with Grommet and he expressed his interest in buying the property at $7.7 million. Grommet expressed his interest in selling the property to the WNG. From Grommet's point of view, a sale to the WNG would keep the property from being subdivided and allow him to lease the ranch back.

[¶ 11] The WNG hired two appraisers to evaluate the ranch. Both appraisers were certified appraisers in the state of Wyoming. Jim Hastings appraised the Gray Rocks Ranch at $7.5 million, while John Pexton appraised the ranch at $7.95 million. Both appraisals were submitted on November 16, 2005. On November 19, 2005, another article appeared in the *Casper Star Tribune* that indicated the governor had put $10 million into his budget for the purchase of the Gray Rocks Ranch, as well as other properties. Between November of 2005 and February of 2006, Newman had numerous contacts with Grommet, the WNG, and others to facilitate the sale of the ranch.

[¶ 12] In mid-February 2006, the listing agreement between Grommet and Newman expired. There had been attempts to enter into another written listing agreement, but Grommet and Newman were not able to meet and sign a new agreement. However, in its findings the district court concluded that the listing agreement was extended orally in that Grommet was giving directions to Newman to continue his efforts to aid the

WNG in getting funding to purchase the ranch. Furthermore, Newman was in contact with the WNG, legislators, and the governor on multiple occasions in order to get the legislature to approve an appropriation to purchase the Gray Rocks Ranch.

[¶ 13] On March 30, 2006, Newman received Grommet's letter terminating him as the listing broker. The district court found that the timing of that letter indicated that Grommet believed that Newman had continued working for him after expiration of the written listing contract.

[¶ 14] On March 9, 2006, the Wyoming Legislature approved $10 million for the purchase of land to expand Camp Guernsey. It was noted in the National Guard newspaper that $7.7 million of the funds was to purchase the Gray Rocks Ranch. General Wright testified that it was the WNG's intent to purchase the ranch. He further testified that the WNG had become a willing purchaser at that time and that the purchase of the ranch was imminent. As soon as the legislature approved funding, Jack Studley, WNG land agent, began preparing a purchase-offer contract. All WNG witnesses who testified indicated that once the legislature had approved funding, the purchase of the ranch was essentially a "done deal." On March 13, 2006, General Wright called Grommet and told him that funding had been approved.

[¶ 15] The district court specifically found that once Grommet knew that the WNG had been appropriated $10 million, he decided to raise the asking price for the ranch. Sometime in mid to late March, Grommet met with Bob Brockman, who is a real estate broker/appraiser. On March 27, 2006, Grommet advised the WNG that Brockman would be the new listing agent/broker for the Gray Rocks Ranch. On March 29, 2006, Grommet listed the ranch with Brockman's business, Keyhole Land Co., and Ranch Marketing Associates (RMA). This agreement provided for a 4% real estate commission. Brockman and RMA entered into an agreement between themselves on March 29, 2006, that provided that if the WNG bought the property, the two brokers would split the fee. However, if a buyer other than the WNG bought the ranch, the selling broker (RMA

or Brockman) would get 75% of the commission and the other would get 25%. These circumstances motivated the district court to conclude that the contract between Grommet and Brockman, et al., clearly supposed that the WNG was already a more than just "likely" purchaser. On March 30, 2006, Brockman advised the WNG that the purchase price of the property was now $8.5 million.

[¶ 16] The district court further found that on March 30, 2006, Newman received a letter from Grommet advising him that his services were no longer needed, but further advising him that he could still be a selling agent. The district court found that Newman believed, and rightly so, that after his long relationship with Grommet that he could not be a selling agent due to a conflict of interest. At about the same time, Brockman prepared a document identified as Exhibit 40. He termed it a critique, but the district court found it was an appraisal review prepared for the WNG. The document was a review of the Hastings and Pexton appraisals previously described herein. Exhibit 40 points to errors in, or otherwise updates, the previous appraisals and then supports a current price of $8.5 million for the ranch. Brockman testified that Exhibit 40 was not an appraisal review. However, the district court found that the expert testimony given by Mr. Hastings, Ms. Weppner, and Mr.

Frascona all were to the effect that Exhibit 40 was an appraisal review, and that a reading of Exhibit 40 could lead to no other conclusion. Exhibit 40 was provided to Pexton. At the request of the WNG, he updated his appraisal and on April 11, 2006, he rendered a new opinion valuing the Gray Rocks Ranch at $8.62 million. The WNG signed a purchase agreement on April 12, 2006, for $8.5 million less than two weeks after Newman was terminated. The sale closed on July 10, 2006. Brockman and RMA each received a commission of $170,000 for a total of $340,000.

## The Contract

■ [¶ 17] With respect to the language of the contract that is most directly pertinent to the issues raised in this appeal, the district court made these findings. The district court first noted that there was a dispute about which of the contracts between Newman and Grommet was in force at the times crucial to the outcome of this case. Grommet contends that the August 2005 through February 2006 listing contract was invalid because it contained no brokerage disclosure statement. The listing agreement of $7.3 million, which was to run from December of 2003 through December of 2005, contained the brokerage disclosure statement as required under Wyo. Stat. Ann. § 33-28-306 (LexisNexis 2009).[4] That statute requires a

---

4. § 33-28-306. Broker disclosures. [This statute was substantively amended effective July 1, 2009.]

(a) Prior to engaging in any discussion or arrangement incidental to a sale, purchase, exchange or lease, and prior to entering into any written agreement, with a buyer or seller, a broker shall make a written disclosure of applicable brokerage relationships which must contain at a minimum the following:

(i) A description of all the different brokerage relationships allowed by this article and a statement that the commission for different relationships is negotiable;

(ii) An explanation of the duties and obligations owed under each such relationship;

(iii) A conspicuous statement of duties and obligations owed by an agent but which are not owed by an intermediary;

(iv) A statement that any established relationship cannot be modified without the written consent of the buyer or seller and that the buyer or seller may, but is not required to, negotiate different commission fees as a condi-

tion of consenting to a change in relationship; and

(v) A statement that an intermediary is not an agent or advocate for any party and has only the obligations set forth in W.S. 33-28-305.

(b) The written disclosure shall contain a signature line for the buyer or seller to acknowledge receipt of the disclosure. The disclosure and acknowledgment, by itself, shall not constitute a contract or agreement with the broker. Until the buyer or seller executes such acknowledgment, no representation agreement shall be executed or valid.

(c) A broker who has established an agency relationship, a subagency relationship or an intermediary relationship with a seller or buyer shall provide notice of that relationship to any other party to the transaction at the earliest reasonable opportunity.

(d) Disclosures made in accordance with this article shall be sufficient to disclose brokerage relationships to the parties to the transaction and to the public.

broker to set forth in detail the different brokerage relationships and the duties of a broker with respect to such relationships. This must be done prior to entering into any written contract between broker and seller. The failure to do so renders the listing agreement invalid pursuant to statute.

[¶ 18] In August of 2005, the previous listing agreement was replaced with another contract raising the price for the entire ranch to $7.7 million. That listing agreement did not contain a brokerage disclosure statement. Grommet contended that since no disclosure was obtained for the August 2005 listing agreement, it was therefore invalid. The district court did not agree with that reasoning because the December 2003 through December 2005 agreement did have a brokerage disclosure signed by Grommet, who clearly was acting on behalf of all sellers. The evidence was overwhelming, in the district court's view, that Grommet was completely in charge of negotiations and was acting on behalf of his wife and sister. Furthermore, the August 2005 listing agreement interrupted the December 2003 agreement and was in fact an extension of the original agreement with an increased sales price of $7.7 million. The district court concluded it would place form over substance to require yet another identical disclosure form and thereby invalidate the August 2005 listing agreement. This Court held in *Roney v. B.B.C. Corp.*, 2004 WY 113, ¶ 27, 98 P.3d 196, 204 (2004) that Wyoming does not favor the forfeiture of contract rights. Here Newman made a disclosure pursuant to § 33–28–306 at the time the 2003 listing went into effect. The district court believed, as do we, that such disclosure was sufficient enough so as to fully advise Grommet, and so as to comply with the statute. Furthermore, it also concluded, without reservation, that Grommet understood all of the agency relationships as well as those other matters required to be disclosed. Thus, the 2005 extension was valid.

■ [¶ 19] The second issue the district court addressed was whether there was or could be an oral extension of the listing contract after it expired on February 12, 2006. Clearly, a listing agreement may be

extended orally or by conduct. *McCartney v. Malm*, 627 P.2d 1014, 1018–19 (Wyo.1981). Here it is evident that the listing was extended orally and by conduct until March 30, 2006. Grommet directed Newman to lobby on his behalf for the legislative appropriation. Grommet, by correspondence, knew that Newman was continuing to talk to the WNG and the governor and other elected officials. Finally, on March 25, 2006, the letter to Newman terminating his services clearly indicated Grommet's knowledge that Newman was still working for him. In early February, Grommet had apparently asked Newman to get with him to formally extend the listing. All of the facts in this case point clearly and convincingly to the conclusion that Newman was working for Grommet with Grommet's knowledge and consent until Newman's discharge. On the basis of these circumstances the district court concluded that the August 2005 listing agreement was orally extended until March 30, 2006, the date on which Newman received Grommet's termination letter.

[¶ 20] Both the 2003 and 2005 agreements contain the following language at sections IV D 3 through IV D 4.

## IV. BROKER COMPENSATION.

. . . .

D.   Seller shall pay Broker the compensation provided by Section IV B hereof within seven (7) days of the date written demand is mailed by Broker to Seller upon the occurrence of any of the following events:

. . . .

3.   If the subject property or any part thereof is sold, exchanged, leased or optioned, or if any other transaction occurs which causes an effective change of ownership of such property from Seller to a third party within 180 days after the expiration of this Contract, to or with any person, firm, corporation or other entity or anyone acting for such person, firm, corporation or other entity to whom the property was introduced by Seller, Broker or any of Broker's Salespeople or by any other person, and whose name was disclosed by Broker to

Wyo. Stat. Ann. § 33–28–306 (LexisNexis 2007).

Seller prior to expiration or by written notice, deposited in the U.S. Mail, certified mail, return receipt requested and postage prepaid, before midnight of the seventh day following the date of the termination of this Contract, exclusive of the date of termination. A written offer to purchase this property submitted to Seller during the term of this Contract shall constitute the notice required by this subparagraph without further notice to Seller.

4. In the event that a commission *is earned for the* lease, *sale* or exchange of this property by another Wyoming licensed real estate broker with whom Seller lists the property at any time after termination of this Contract, the protection stated in Section IV D 3 above shall be waived so that *Seller is not liable for dual commissions*." [Emphasis supplied.]

[¶ 21] Newman contended that he is due the commission for the sale since the word "earned" in paragraph IV D 4 means procuring cause of the sale. The district court concluded that his position was supported by his own testimony, that of his experts, Mr. Frascona and Ms. Weppner, as well as that of Grommet's witnesses, Brockman and Pearson, from their prior deposition testimony. Newman asserted he was the procuring cause of this sale and that Brockman did not earn a commission. Grommet's position is that the word "earned" means only that a subsequent broker did whatever he is required to do under his contract to earn a commission. The underlying purpose of Section IV D 4 is clear on its face. It is designed to prevent the seller from being required to pay two commissions. Given that purpose, the district court concluded "earned" does not mean procuring cause. Rather, he determined it meant that the subsequent broker did what that broker must do to be entitled to a commission. Here the commission was paid to Brockman and to RMA. That commission was due pursuant to the terms of Grommet's listing agreement with Brockman and RMA. To rule otherwise would be to invite lawsuits every time there was a subsequent broker. That could not possibly have been the intention of

the Wyoming Association of Realtors when they prepared the agreements in question. The issue of procuring cause typically arises where there are not direct contracts with the seller on the listing side, but rather conflicts between the brokers on the selling side of the real estate transaction. Where there is a contract, the contract must be the determining factor in most cases. See *Wanger v. Havey*, 393 S.2d 874 (Louisiana 1981).

[¶ 22] The district court's discussion continued: Newman contended that Brockman did not earn his commission as a realtor but rather acted as an appraiser only. Brockman's activity as an appraiser, it is alleged, was a conflict of interest in his activity as a real estate broker, therefore precluding a fee as a broker. The district court found that Brockman's work in Exhibit 40 was an appraisal review. It comments on and criticizes the Hastings and Pexton appraisals. It was done to justify a higher appraisal. Brockman was a certified appraiser. The intent of the document was to persuade the WNG that the existing appraisals were not sufficient. This simply is an appraisal review done by an appraiser. This may have been a conflict of interest on the part of Brockman. It may have been a violation of his rules and guidelines as an appraiser, but the district court concluded that Grommet had not pointed to legal authority or arguments that would mandate that Brockman forfeit his real estate fee for that reason.

**Bad Faith**

[¶ 23] Once again we track the findings of the district court. Newman alternatively alleged that Grommet acted in bad faith and that he is therefore responsible to pay his commission regardless of the listing agreement. Newman relies on the case *Havens, supra*, 61 Wyo. 309, 157 P.2d 570. In that case Havens sued Irvine, a property owner, for a commission. Havens had introduced Irvine to a buyer. After negotiations stalled and the passage of some several months, Irvine cancelled the listing agreement and the next day sold the property to that prospective buyer. The district court found in favor of Havens. The judgment was reversed on appeal, because the Wyoming Su-

preme Court held that there was no bad faith. While Havens had introduced Irvine to the eventual buyer, negotiations had stalled and Havens had really done very little in the succeeding months to earn a commission. The Supreme Court held that:

> 'Bad faith' in respect to the right of a broker to his commission has been said to arise where the owner revokes the broker's authority, or makes the sale through other means, when the broker has performed all he has undertaken or is plainly or evidently approaching success in his undertaking, or where a sale is made behind the broker's back.

*Havens,* 157 P.2d at 573. Newman asserted that this language entitled him to his commission based on the facts of this case. On the other hand, Grommet contended that he did nothing more than exercise his contractual rights under a listing agreement that was prepared or at least provided by Newman.

[¶ 24] In *Scherer,* this Court elaborated on the principles of good faith in a contractual situation. That case noted that the concept of a breach of the covenant of good faith in both tort and contract situations had been recognized. In tort cases, there must be a special relationship that exists between a plaintiff and a defendant. Such cases are usually restricted to the employer/employee relationship or insurance relationships. However, in *Scherer* this Court went on to hold that every contract imposes a duty of good faith and fair dealing in its performance and its enforcement consistent with Section 205 of the Restatement Second of Contracts. *Scherer,* ¶¶ 16–25, 18 P.3d at 652–656. Since *Havens* was decided many years before *Scherer,* the district court concluded that *Scherer* only amplified what had been said in *Havens.*

[¶ 25] The district court also noted that in *Scherer* this Court approved these precepts: (1) The implied covenant of good faith requires that neither party commit an act which would injure the rights of the other party to receive the benefit of their agreement; (2) compliance requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party; (3) "The purpose, intentions, and expectations of the parties should be determined by considering the contract language **and** the course of dealings between and conduct of the parties." (4) The covenant of good faith may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. "The implied obligation 'must arise from the language used or it must be indispensable to effectuate the intention of the parties.'" In the absence of self dealing, breach of "community standards of decency, fairness, and reasonableness," the exercise of contract rights alone will not be considered a breach of the covenant. *Scherer,* ¶ 19, 18 P.3d at 653–54.

[¶ 26] The district court reiterated the salient facts based upon the principles set out above. Newman and Grommet had a long-term relationship going back nearly 10 years. They had been involved in over 20 real estate transactions together. The Gray Rocks Ranch was listed on and off by Grommet since 1998. Newman had advertised the Gray Rocks Ranch extensively. He had expended tens of thousands of dollars on advertising and shown the ranch on multiple occasions to prospective buyers. Newman introduced the WNG to Grommet. Newman's advertising had interested the WNG in the Gray Rocks Ranch. As between brokers, it is clear and convincing that Newman was the procuring cause of the sale. Newman found a ready, willing, and able buyer, and his efforts were the predominating cause of the sale. All of the WNG personnel who testified believed that Newman put the deal together. See *McCartney,* 627 P.2d at 1020. The district court was convinced that the WNG, by mid 2005, and certainly no later than October of 2005, had concluded that it wanted the property. The only impediment to the purchase was the approval of funding by the legislature. Newman worked diligently in an effort to have the legislature approve funding. He talked to legislators, the governor, and WNG personnel. By March 10, 2006, funding was approved. At that point, the sale was going to happen. The WNG was going to purchase the ranch

and it was in the process of preparing contracts. Up to the time he was terminated on March 30, 2006, Newman was doing all he could to facilitate the sale. His efforts were ongoing through requests by, the knowledge of, and the acquiescence of Grommet.

[¶ 27] The district court's reasoning continued. While Newman was working for Grommet in March of 2006, Grommet met with Brockman no later than March 22, 2006. At that meeting, or before, Grommet decided to fire Newman and hire Brockman at a reduced fee of 4% and at the same time raised the price of the ranch to $8.5 million. The district court was convinced that the reduced real estate fee was based on everyone's assumptions that the WNG would buy the ranch. The increased purchase price of $8.5 million was clearly based upon the fact that the WNG had been appropriated $10 million to make land purchases. At trial, Grommet testified that when he increased the purchase price to $8.5 million, he felt the WNG was then out of the picture as a buyer. The district court found that testimony to be at odds with the facts. Brockman's appraisal review was prepared to demonstrate to the WNG and Pexton that the new asking price was viable. The agreement between Brockman and RMA anticipated a sale to the WNG. In fact, the deal was done in early April.

[¶ 28] The district court found the evidence to be clear and convincing that on both occasions when the WNG publicly indicated or otherwise achieved the amount they were seeking as an appropriation, Grommet raised the price. The district court also concluded that Newman would have been able to achieve an increased price of $8.5 million had he not been terminated since the WNG only needed an increased appraisal to pay the asking price. Continuing, the district court found that Brockman's participation achieved two goals for Grommet. Brockman's experience and reputation as an appraiser allowed him to prepare an appraisal review justifying the $8.5 million asking price, and he was willing to take a reduced 4% commission apparently in light of the likely and, in fact, almost immediate sale to the WNG. Grommet's firing of Newman and the hiring of Brockman netted him an additional $1,000.000.00 from the WNG, and reduced his real estate commission by some $245,000.00. While Grommet may purport to be a good businessman, the question here, the district court concluded, was whether his activities amounted to bad faith and unfair dealing.

[¶ 29] The district court went on to note that the plain language of *Havens* can be employed to make out a case for bad faith. But bad faith, according to *Scherer*, cannot exist in a contractual situation where one party is simply asserting its contractual rights absent some special circumstances indicating a departure from reasonable and fair community standards. Grommet reiterated many times during the trial that he was simply invoking his rights under a contract prepared by Newman. However, the contract did not represent unequal bargaining positions. Grommet specified the term and whether the contract would exist at all. Grommet could not have had a contract on his terms with any other real estate broker. Thus, the district court did not believe that Grommet should be accorded any deference simply because the contract was on a form prepared by the Wyoming Association of Realtors.

[¶ 30] In light of its summary of the evidence that the district court found to be credible, it found that bad faith did exist in this matter on the part of Grommet. The relationship between Newman and Grommet was longstanding. It had been beneficial to both. There was certainly trust involved. Grommet entrusted Newman with advertising and selling a large asset, as well as lobbying the legislature and the governor to assist in that regard. Newman so trusted Grommet that he worked diligently between mid-February and mid-March of 2006, without a written listing contract. This trust was well-founded since Grommet had invited Newman to meet in order to extend the listing agreement. Apparently, Newman just had not had the opportunity to do so.

[¶ 31] It was clear that the WNG was going to buy the property once the funding was appropriated. Before Newman was terminated, it was evident that the deal was

going to happen. Only the paperwork and Grommet's last-minute efforts to raise the price remained. On the day Grommet was meeting with Brockman, Newman—with Grommet's knowledge—was still working to finalize the deal. Finally, the letter of termination was sent to Newman itemizing his deficiencies as a realtor. The district court expressed his conviction that the termination letter was an after-the-fact document prepared by Grommet to serve as a paper trail for dismissing Newman. The district court did not believe that the reasons set forth in the letter were the reasons Newman was terminated. Rather, it believed that the termination was designed solely to lower the real estate commission and get Brockman's assistance in raising the price. The district court iterated its virtual certainty that the same deal could have been reached with Newman as the real estate broker, except that the commission would have been considerably higher.

[¶ 32] Finally, Brockman's assistance here was primarily that of appraiser. He did not show the property, did not advertise the property, (the only advertisements that were sent out occurred after Grommet and the WNG signed the agreement to sell), and in fact, the deal was done only a couple of weeks after Brockman was involved. The district court based its ultimate decision on these unique circumstances of this case:

1. The long-term relationship,

2. The many hours invested by Newman,

3. The large amount of money invested by Newman,

4. Newman's being the procuring cause of the deal,

5. The funding for the deal having been appropriated,

6. Grommet's allowing Newman to continue working while he was negotiating with Brockman,

7. Grommet's stated reasons for terminating Newman were not true, and

8. Grommet's actual reason for terminating Newman was to save some portion of the real estate commission that truly had been earned.

[¶ 33] When the closing on this real estate transaction took place on July 10, 2006, Brockman and Ranch Marketing Associates split a $340,000.00 commission for having sold the Gray Rocks Ranch.

[¶ 34] The district court concluded that, based upon clear and convincing evidence, Grommet, acting on behalf of his wife and sister, began a process of self-dealing that was contrary to the prevailing community standards of fairness and reasonableness. The district court underscored that point by noting that all of the WNG witnesses were surprised by Newman's termination after the efforts he put in on the deal. The district court concluded that all the equities were on Newman's side and that Grommet's actions were motivated, not by any dissatisfaction with Newman, but rather by his desire to make more money. Furthermore, Grommet's bad faith became transparent when he testified that when he raised the price of his ranch to $8.5 million, he had thought the WNG was out of the deal. The district court found such a statement was not believable. In fact, the district court noted, it could only conclude that such a statement was made because Grommet knew that he needed to inject some uncertainty into the deal with the WNG. Without raising uncertainty, the district court continued, Grommet's treatment of Newman, even to Grommet himself, must have appeared blatantly unreasonable and unfair.

[¶ 35] The district court also addressed other arguments raised by Grommet. The first was that Newman breached his duties by telling other buyers that they were in a back-up position to the WNG and that he failed to follow up with other prospective purchasers or give Grommet messages regarding other potential buyers' interest in the ranch. The district court concluded from the trial testimony that those issues were within the ambit of a real estate agent in his dealings with potential interested buyers. There is nothing whatsoever to indicate from the evidence that Newman did anything, or failed to do anything, that would have resulted in a sale to another prospective buyer.

[¶ 36] Much ado was made of Newman filing a *lis pendens* prior to closing. While the legality of such a legal maneuver can be questioned, the sale to the WNG was not interrupted. Rather, the parties agreed that Grommet would place monies in escrow pending the outcome of this case. Therefore, given that the district court found in favor of Newman, it further decided that Grommet had suffered no damage. Much ado was also made of Grommet acting on behalf of his wife and sister without their apparent authority. The district court concluded that the record was plain in demonstrating that Grommet did act on their behalf and as their agent in all of the business dealing associated with this case and that he acted with their authorization either impliedly, or apparently, or both.

[¶ 37] The district court granted judgment for Newman in the amount of $537,000.00. Grommet appeals that portion of the judgment. The district court denied Newman his claim for attorney's fees and Newman appeals from that portion of the judgment. The district court concluded that attorney's fees were not warranted because Grommet did not violate a written provision of the contract; rather, Grommet violated only the implied covenant of good faith and fair dealing.

### DISCUSSION—Case No. S–08–0148

### Standard of Review

■■■ [¶ 38] We review a district court's decision following a bench trial according to the following standards:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with

the definite and firm conviction that a mistake has been committed.

> Further, with regard to the trial court's findings of fact,[W]e assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

> The district court's conclusions of law however are subject to our *de novo* standard of review.

*In re Estate of Thomas,* 2009 WY 10, ¶ 6, 199 P.3d 1090, 1093–94 (2009) (internal citations omitted).

[¶ 39] We address each of the issues raised by Grommet below:

### Special Contract of Employment

■■■ [¶ 40] Grommet posits that the contract between him and Newman is a "special contract," and that that circumstance is central to the resolution of this case. In the course of his discussion, Grommet makes general reference to 23 Richard A. Lord, *Williston on Contracts,* § 62:19 (4th ed. 2002). That section, and the ones that precede and follow it, cover much ground and Grommet's argument does not appear to take into account the full import of those sections. Moreover, the discussion does not appear to be directly tied to the circumstances of this case. We have carefully perused the materials found in *Williston,* and we are unable to agree that the argument Grommet propounds is supported by the material contained therein. Of significance, we also note that Grommet does not direct our attention to where in the record this specific argument was made to the district court or where in the district court's findings this matter is discussed or relied upon, or rejected by, the district court in reaching its decision.

[¶ 41] Grommet also relies upon this Court's decision in *McCartney,* 627 P.2d at 1021, for this proposition. Once again, we are unable to discern from Grommet's brief exactly how the proposition argued in this appeal was directed to the attention of the

district court or how the *McCartney* decision supports the point argued for in this section of his brief. However, we do discern two parts of that opinion which appear to have relevance here and those we set out below:

> Whether or not the meaning that appellants desire to give to the agreement was conveyed to appellee Kent Malm was a question of fact for the trial court. *Madrid v. Norton*, Wyo., 596 P.2d 1108 (1979). The trial court did not make specific findings in this regard, but it did find that there was no evidence of any collusion between appellees and others designed to deprive appellants of their commission, and it found that there was no evidence of bad faith on the part of appellees "at any time in this transaction." Implicit in the finding of no bad faith is the conclusion that appellees did not understand that the agreement provided for payment of a commission upon sale of the property after expiration of the listing period.

> " * * * 'Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.' * * * " *Cone v. Ivinson*, 4 Wyo. 203, 33 P. 31, 34 (1893) quoting from *Gress v. Evans*, 1 Dak. 387, 46 N.W. 1132 (1877); *Wendling v. Cundall*, Wyo., 568 P.2d 888, 890 (1977); see 12 Am.Jur.2d Brokers §§ 100 and 167.

*McCartney*, 627 P.2d at 1019–20.

The application of this limitation to appellants' rights under this agreement is supported by this description of an exclusive right to sell:

> As a general rule, a broker who has been granted either an exclusive agency or an exclusive right to sell or lease property is entitled to a commission, at least by way of damages, on a sale or lease by or through another broker during the existence of the first broker's exclusive agency or right. Also, a broker who has been given an exclusive right to sell or lease property is entitled to a commission, at least by way of damages, on a sale or lease by the owner himself, without the aid or intervention of any broker, within the time specified in the contract of employment.

> To entitle a broker who has an exclusive agency or exclusive right to sell to a commission, a transaction effected by the principal himself or through another broker must be of the nature contemplated by the agreement. The sale or other transaction must occur within the time when the exclusive agency or right to sell exists, but the conclusion within that time of a contract is sufficient, even though a formal transfer of the property does not occur until later. * * * " (Emphasis supplied.) 12 C.J.S. Brokers s 175, pp. 555, 559. See also, 12 Am.Jur.2d Brokers s 220. Annotation: *Brokers right to commission on sales consummated after termination of employment*, 27 A.L.R.2d 1348 (1953); *Diehl & Associates, Inc. v. Houtchens*, 173 Mont. 372, 567 P.2d 930 (1977).

Under the listing agreement the commission would be earned only if a sale were made during its term. Such was not here done. But even if the listing agreement were the more usual type and provided for payment of the commission upon the finding of a ready, able and willing buyer, it would have been difficult in this case for the trial court to have found appellants to have been the procuring cause of the sale to the extent necessary to entitle them to a commission. The evidence was substantial that appellees had concluded that appellants were not able to bring about an exchange with the Kelly property, and that the final exchange arrangement was accomplished by other real estate brokers. Where several brokers are involved, the commission is to be paid to the one who can show that his efforts were the efficient, predominating and procuring cause of the sale. There cannot be multiple procuring causes. The broker bringing about the meeting of minds and making it possible for the transaction to be consummated is entitled to the commission. See 12 Am. Jur.2d Brokers s 230; 12 C.J.S. Brokers s 171; *Reed v. Taylor*, 78 Wyo. 216, 322 P.2d 147 (1958). Viewing the evidence under the following standard, as we must, it does not reflect that appellants were the effi-

cient, predominating and procuring cause of the sale:

"* * * (W)e must assume that the evidence in favor of the successful party is true, leaving out of consideration entirely the evidence of the unsuccessful party that conflicts with it, and giving to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it. * * * " *Jelly v. Dabney,* Wyo., 581 P.2d 622, 624 (1978); *Madrid v. Norton,* supra.

Further, the evidence viewed under this standard supports the finding by the trial court of good faith on the part of appellees. [Emphasis added.]

*McCartney,* 627 P.2d at 1022. It is our conclusion that the *McCartney* case supports the district court's findings and conclusions, rather than the theory propounded by Grommet in this argument.

[¶ 42] Grommet also cites *Owens v. Mountain States Telephone & Telegraph Co.,* 50 Wyo. 331, 63 P.2d 1006, 1009, 1015–16 (1936) for the proposition that the contract at issue here was a "special" contract. We were unable to discern such a holding in that case. That opinion contains a lot of interesting information on the subject, much of which could be said to support the district court's decision herein, but as to special contracts it really only holds that the existence of a special contract need not be pled in order to get that issue before a jury (fact finder). *Id.* at 1016. On Page 40 of his brief, Grommet includes a snippet from the *Owens* case. We set out the snippet here in its full context (with the sentence Grommet draws our attention to highlighted immediately below):

It is argued that the evidence in the case is not sufficient to warrant any judgment for the plaintiff. We have found this question to be an exceedingly difficult one. No cases involving facts exactly like those in the case at bar have been cited, and we have found none. Whether or not a commission is due to a broker depends largely upon the contract entered into between him and the owner. *Kimmell v. Skelly,* 130 Cal. 555, 62 P. 1067, 1068. *If he has not complied with his contract, if he has not accomplished or done what he has undertaken to do, while his authority exists, he is not, in the absence of some fault of the owner, entitled to a commission.* He must fulfill, if not prevented by the owner, the duty undertaken by him, and within the time given him, or he is not entitled to any compensation. 9 C.J. 587, 588; note, 139 Am.St.Rep. 241; note, 26 A.L.R. 784. If, on the other hand, a broker has done that which he was employed to do, he becomes entitled to his commission. *Westlund v. Smith* ([1935]) 291 Mass. 96, 196 N.E. 147; *Schneider v. Stewart,* 173 Okl. 596, 49 P.2d 186; *Hugill v. Weekley,* 64 W.Va. 210, 61 S.E. 360, 15 L.R.A. (N.S.) 1262. Courts, and the parties herein, speak of an ordinary contract of a broker (without special terms) and a special contract; that is to say, a contract with special terms. They do not agree what the contract herein actually was. Counsel for the defendant have argued the case solely from the standpoint that the contract herein was a special one, namely, that the plaintiff should make a sale or find a purchaser at the price of $25,000 and no less, and that within a definite period of time. There can be no doubt that if the parties make a special contract, one, for example, to the effect that no commission will be due unless the property in question shall be sold for a definite price, and on definite terms, or that a definite result shall be reached, no commission will be due if these terms are not complied with, unless they are waived by the owner. Restatement of the Law of Agency, § 447, and comment thereon; note, 43 A.L.R. 1111, under subd. IV; *Knoechelma's Adm'r v. Knoechelmann,* 242 Ky. 662, 47 S.W.2d 534; *Kirby L. Co. v. West* (Tex. Com.App.) 236 S.W. 449; *Murphy v. W. & W. Live Stock Co.,* 26 Wyo. 455, 187 P. 187, 189 P. 857; *Watson v. Odell,* 58 Utah, 276, 198 P. 772. *But it must be observed that a material distinction must be drawn—applicable throughout—between cases in which no sale is made, and those in which one is actually made by the owner to the customer produced by the broker. Harris v. Owenby,* 58 Okl. 667, 160 P. 596. *And a waiver of the condition as to terms is*

*readily and generally implied, where the owner proceeds to negotiate with the customer furnished by the broker and concludes a sale satisfactory to him.* Note, 43 A.L.R. 1104; note, 15 L.R.A. (N.S.) 273, 44 L.R.A. 350, note g. "If this were not so," states 4 R.C.L. 322, "it would be very easy for an unscrupulous person having property for sale to get all the benefits of the broker's services in bringing the property under the notice of buyers and introducing them, by the simple method of fixing the price at a figure which he knows no person would give, and the reduction of which he is prepared to accept." The rule is stated somewhat differently, but to the same effect, in 4 R.C.L. 313, where it is said: "Where a broker instead of procuring a person who is ready, able and willing to accept the terms his principal authorized him to offer at the time of his employment, procures one who makes a counter offer more or less at variance with that of his employer, the latter is at perfect liberty either to accept the proposed party upon the altered terms or to decline to do so. If he accepts, he is legally obligated to compensate the broker for the services rendered."

Hence, as stated in other cases, a broker is entitled to his commission when he produces a purchaser who buys at a price satisfactory to the owner (unless the price has been made a condition of the payment of a commission). *Wareham v. Atkinson,* 215 Iowa, 1096, 247 N.W. 534; *Home Banking & Realty Co. v. Baum,* 85 Conn. 383, 82 A. 970; *Weiss v. Gaines* (Tex.Civ. App.) 51 S.W.2d 428; *Clements v. Stapleton,* 136 Iowa, 137, 113 N.W. 546. [Emphasis added.]

*Owens,* 63 P.2d 1006 at 1008–9. The *Owens* case also supports the district court's decisions.

[¶ 43] Grommet refers us to our decision in *Havens v. Irvine,* 61 Wyo. 309, 157 P.2d 570 (1945) in conjunction with this particular argument and so we address the opinion, or rather the *opinions,* issued in that case here, although it also figures in other arguments we will address later. In that case the real estate broker won his case in the trial court.

District Judge Tidball wrote the principal opinion. In it he set out the facts in detail and concluded:

The cases on this latter point are collected in notes in 43 A.L.R. 1104, and 44 A.L.R. 350(g) [sale to buyer who was produced by broker, but sale consummated by seller/owner]. An examination of these cases will, we believe, disclose that no court has held that a broker is entitled to his commission where the sale is made after his agency is terminated either by the express terms of the contract or by the act of the principal after the lapse of a reasonable time, where no time is specified in the contract, unless it was further found that the principal did not act in good faith or acted fraudulently, as is sometimes stated, in terminating the contract or in postponing the sale until the agency was terminated by the lapse of time specified in the contract. 'Bad faith' in respect to the right of a broker to his commission has been said to arise where the owner revokes the broker's authority, or makes the sale through other means, when the broker has performed all he has undertaken or is plainly or evidently approaching success in his undertaking, or where a sale is made behind the broker's back. In another case it is said that 'bad faith' means a purpose to obtain profits from the broker's exertions without payment, and exists where the employer revokes the broker's authority and makes the sale through other means when the broker has performed all he has undertaken or is plainly or evidently approaching success. *Sherman v. Briggs Realty Co.,* 310 Mass. 408, 38 N.E.2d 637, 640, and *Kacavas v. Diamond,* 303 Mass. 88, 20 N.E.2d 936, 938. In *Kellogg v. Rhodes,* 231 Iowa 1340, 4 N.W.2d 412, 415, it is said:

'If the principal acts in bad faith in a fraudulent attempt to avoid paying a commission to the broker who is the moving cause of the sale, the principal is held liable. * * * It cannot be said as a matter of law, however, that appellee so acted.'

For other cases holding that where the broker is to receive his commission only when he sells on certain terms fixed by the principal, he cannot recover his commis-

sion even though the principal sells to someone introduced by the broker on different terms, unless the owner acts in bad faith, see cases cited on page 1112 of 43 A.L.R., and on page 857 of 44 A.L.R., and especially the cases of *Patton, Temple & Williamson v. Garnett*, 147 Va. 1009, 133 S.E. 495; *Walsh v. Grant*, 256 Mass. 555, 152 N.E. 884, 47 A.L.R. 852; *Kellogg v. Rhodes*, supra; and *Hodgin v. Palmer*, 72 Colo. 331, 211 P. 373.

. . . .

The outstanding fact is that here we have always non-success on the broker's part to comply with the listing contract which had been agreed upon. The owner had waited five months for the broker to fulfill that contract. Yet at the time the termination of the authority took place, the entire business of selling the ranch was at a complete standstill. There is, we think, not a scintilla of evidence or any circumstances whatsoever in the case that disclose that the broker would have earned a commission if Irvine, the defendant, had refrained from doing what he did in terminating the former's authority.

The rule in such a situation has been concisely stated by Mr. Justice Campbell in *Hodgin v. Palmer*, 72 Colo. 331, 211 P. 373, 376, thus:

'The plaintiffs never succeeded in bringing the minds of the buyer and seller to an agreement of sale at the price and terms upon which sale was authorized by the owner, and there is no proof that they probably could or would have succeeded, within a reasonable time, in doing so. In the absence of such proof, the right to a commission does not accrue. That has been often decided by this court.'

*Havens*, 157 P.2d at 573–74. We conclude that this portion of the *Havens* opinion does not aid Grommet in his arguments to this Court.

[¶ 44] Justice Riner authored a lengthy concurring opinion in which he fully agreed with Judge Tidball but cited a number of other cases at length, all of which are readily distinguishable from the case at bar. Justice Riner concluded:

It would seem clear, as pointed out in the main opinion herein, that the proof utterly fails to establish a performance of the terms of the original listing. The condition to earning a commission herein was that the sale should be entirely for all or a large part in cash to be paid to Irvine. The compensation was to be earned when a customer should be obtained who would pay this price. There is no pretense that such a purchaser was found or that such a sale was made. Irvine finally entered into an altogether different sale agreement. The performance relied on by the plaintiff does not meet the requirements of the rule announced by the decisions hereinabove reviewed and cited, and succinctly declared by Mr. Justice Nelson in *McGavock v. Woodlief*, 61 U.S. 221, 227, 20 How. 221, 15 L.Ed. 884, where he said:

'The broker must complete the sale; that is, he must find a purchaser in a situation and ready and willing to complete the purchase on the terms agreed on, before he is entitled to his commissions. Then he will be entitled to them.'

*Havens*, 157 P.2d at 578–79.

[¶ 45] Justice Blume penned a spirited dissent. It begins with a restatement of the operative facts:

I dissent. And I consider the main principle involved herein of such vital importance that I feel that I must not refrain from discussing this case, including the moral elements that appear herein, with an utmost candor and frankness, but I shall do so, I hope, with due deference to the legal ability and learning of my associates herein. Some of the facts are not adequately stated in the majority opinion, and I shall state them. The property involved herein was listed for sale with plaintiff, as agent or broker, in March, 1941. Defendant, the owner, wanted $20,000 cash, net to him. Upon suggestion of the agent, the price to the purchaser was fixed at $22,000, so that the agent could receive his commission of 5% out of the price over and above $20,000. Von Forell was found by the agent as a possible purchaser, and was introduced by him to the defendant. The price of $22,000 was satisfactory to Von

Forell, but the terms of payment were not. Negotiations were continued between the agent and Von Forell, and a subagent of plaintiff at Torrington and Von Forell, during the spring and summer months. At least, the trial court had the right to so find. And the trial court had the further right to find that the plaintiff was the predominating cause of the sale ultimately effected. It is very doubtful that the defendant would ever have found Von Forell as a purchaser, for he was found near Torrington, far from defendant's land, by a subagent of plaintiff. On August 26, 1941, the defendant, through his friend Neeley, sent for Von Forell to continue the negotiations for the sale of the land. At least the court had the right to infer that defendant, before he attempted to revoke the agency, knew of the fact that Von Forell had been asked to come on his behalf and that he ratified Neeley's act. The effect would be the same, and so, for brevity's sake, I shall hereafter consider it as though defendant himself sent for Von Forell. On August 27, 1941, defendant served notice of termination of agency on the plaintiff. On August 28, 1941, defendant sold the property to Von Forell for the sum of $22,000 on easy terms.

The cases on the right of a broker to recover a commission are very numerous, and seemingly confusing, even in cases from the same state. Statements may be found in the authorities which seem to sustain almost any kind of contention which the owner, who seeks to evade the payment of a commission, might see fit to make. Hence, the facts in a particular case are important. Assuming that the rule of *Owens v. Mountain States T. & T. Co.*, hereinafter quoted, is not broad enough to permit the plaintiff to recover herein by reason of the fact that the element of revocation is in this case, then I think the controlling question in this case is as to whether or not the agency here involved was, under the circumstances of this case, revoked in good faith. It is a universal rule that, 'in order that a revocation of a broker's authority may defeat his right to commissions or other compensation it must be made in good faith and not

as a mere device to appropriate the benefit of his services and efforts and at the same time escape the payment of commissions earned or about to be earned.' 12 C.J.S., Brokers, § 66, p. 151. If the agency was not revoked in good faith in this case, the revocation was void, and will be treated as though in force on August 28, 1941, just as plaintiff pleaded it was. 12 C.J.S., Brokers, § 66, p. 152. I shall not enter into the discussion of any collateral questions, except as bearing on the controlling one herein. The trial court evidently held that the agency was not terminated in good faith. The judgment in favor of plaintiff implies that. The majority opinion herein holds that there was not sufficient evidence in this case to so hold. It is mentioned that the agency was revoked 'for the present time,' as though that might indicate good faith. But that is a strange conclusion. If it shows anything, it points directly at the intended negotiations with Von Forell, then in progress or about to occur soon, and to the intended evasion of payment of any commission if sale to Von Forell were made, and that is the very subject matter involved herein. The opinion cites *Kellogg v. Rhodes*, 231 Iowa 1340, 4 N.W.2d 412, 415, as holding that bad faith could not be inferred as a matter of law. I agree with that. The court also refers to *Brown v. Wintermute*, 59 Wyo. 254, 139 P.2d 435, that fraud must be established by clear and convincing evidence. I do not disagree with that rule. Fraud must be shown. *But it would not be possible in one case out of a thousand to show bad faith in a case of this kind except by the circumstances themselves, and if the circumstances in this case are not sufficient from which the trial court could infer bad faith, then we might as well quit talking about such a rule.* What possible inference could be drawn in this case, when defendant sent for Von Forell on August 26, 1941, terminated the agency the next day, and, on the day subsequent, made the sale to the purchaser found by the agent, except the fact that the agency was terminated to evade the payment of a commission? It seems to me that the conclusion of bad faith is irresistible. In any

event the trial court had the right to draw that inference, and we are not justified to reverse its holding when the facts warrant it, which they clearly did in this case. In fact, the circumstances in this case are much stronger than any which I have found to lead the trial court to the result which it reached. I have made as exhaustive investigation on this point as the short time in which to write this dissenting opinion permitted, and I think that I can say with a great deal of confidence that there is not a single case on record which sustains the holding of the majority herein in its holding on that point, under circumstances anywhere near to those in this case, and there are a number of cases which squarely hold, or indicate, the direct contrary. [Emphasis added.]

*Havens*, 157 P.2d at 579–80. We take into account that Justice Blume's writings are a dissent, but given the facts at large in the instant case, it speaks more directly to the decision we must make here, than did the majority decisions.

[¶ 46] To bring an already too long story to a conclusion, we hold that whether the contract at issue was a "special" or "general" contract was simply not an issue of significance in this case, and we decline to embrace the reasoning offered to us by Grommet.

### Application of "Procuring Cause of Sale"

[¶ 47] Grommet contends that a discussion of "procuring cause" and or the meaning of "earn" in the context of this case is not applicable because the contract here was a "special" as opposed to a "general" contract. Grommet does not associate this discussion with any particular portion of the district court's findings, and it is our conclusion that we need not further address that issue here, although "procuring cause" and "earn" will come up in other portions of this opinion.

### New Broker Extinguishes Newman's Claims

[¶ 48] Grommet contends that his hiring of Brockman extinguished any right Newman had to earn a commission because Section IV D 4 of their contract protected Grommet from paying "dual commissions."

Continuing, he contends that because he paid Brockman a commission he cannot be held to owe a commission to Newman as well. Furthering this argument, Grommet contends we must limit our analysis of this issue to what this Court had to say in the *Havens* case and may not apply law that enlarges upon or changes in any way the law set out by the majority in *Havens*. This applies in particular, Grommet claims, to our holding in *Scherer*, ¶¶ 19–24, 18 P.3d at 653–55. Grommet asserts, citing, *Whitlock Construction, Inc. v. JPB*, 2002 WY 36, 41 P.3d 1261 (2002), that "[t]he implied covenant is never breached 'where the parties' actions are in conformity with the clear language of the contract.'" However, that opinion says much more than that:

Whitlock claims that the JPB breached an implied duty which existed in the contract to use good faith efforts to obtain the concurrence of the funding agencies. In *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 2001 WY 23, ¶ 24, 18 P.3d 645, ¶ 24 (2001), we adopted § 205 of the Restatement, Second, Contracts and held that parties to a commercial contract may bring a claim for breach of the implied covenant of good faith and fair dealing based upon a contract theory. Because we have said that a valid contract existed between Whitlock and the JPB, it follows that a covenant of good faith and fair dealing is implied in the contract.

The implied covenant of good faith and fair dealing requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party.... The purpose, intentions and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties. The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties. **In the absence**

of evidence of self-dealing or breach of community standards of decency, fairness and reasonableness, *the exercise of contractual rights alone will not be considered a breach of the covenant.*

*Scherer,* at 653–54 (internal quotes and citations omitted). Although many claims for breach of good faith involve questions of fact making summary judgment inappropriate, summary judgment may be appropriate where, under the facts in the record, *the party's actions were in conformity with the clear language of the contract. Scherer,* at 654, fn. 2. [Emphasis added.]

*Whitlock Const.,* ¶¶ 23–24, 41 P.3d at 1267.

[¶ 49] Our examination of the record on appeal, and of the district court's findings based upon that record, leads us to the conclusion that the district court's findings in this regard are not clearly erroneous. Indeed, its findings that Grommet breached the covenant of good faith and fair dealing are roundly supported by the record.

### Oral Extension of Contract

■ [¶ 50] Grommet contends that the district court erred in finding that the agreement between Newman and Grommet was extended orally and by their conduct. Grommet's contentions in this regard fly in the face of the district court's findings as to credibility of witnesses. The district court made it quite clear that Grommet's testimony, as well as that of the witnesses he called in support of his contentions, was not believable. By the same token, the district court fully credited the testimony of Newman and the witnesses called in support of his contentions, including all the WNG witnesses. When we consider all the testimony offered by Newman on this issue, and disregard the contradictory testimony offered by Grommet, we can only conclude that the district court's fact findings were not clearly erroneous and that its application of the applicable law was sound.

### Denial of Due Process

■ [¶ 51] This matter was thoroughly discussed and resolved during the trial. The trial in this case was conducted in two sittings. The first sitting was on October 22–25, 2007, and the second on December 3–4, 2007. When the district court made its decision to reverse its initial grant of partial summary judgment, to the effect that the covenant of good faith and fair dealing was not at issue in this case, it was made clear that Grommet could recall witnesses that had already testified and been excused, as well as to call any additional witnesses he might need to call in order to further his concerns about "new" law being brought to bear on the case. Likewise, the district court's decision to consult more recent cases that enlarged upon previous precedents pertinent to the implied covenant of good faith and fair dealing did not unfairly "surprise" Grommet or alter the landscape of this case. In sum, the proceedings conducted by the district court in this case did not deprive Grommet of due process of law.

### Grommet Did Not Breach the Implied Covenant

■ [¶ 52] Grommet contends that his conduct did not violate the implied covenant of good faith and fair dealing. The district court ably set out its reasons for finding that the covenants had been breached and we conclude that the evidence adduced at trial fully supports that conclusion. Once again, we need to stress that the argument propounded by Grommet in this regard depends almost entirely on the testimony (and actions) of Grommet and his witnesses, in order that it be accorded any persuasiveness. The district court accorded no credibility to them and we will not second guess that aspect of the district court's decision. There are a number of secondary undercurrents in this case that the district court did not broach, but which we think need some brief mention. First, the WNG and the State of Wyoming generally, must, by law, operate transparently. The record strongly suggests that the price of the ranch was raised to $8.5 million *only* because the WNG had $10 million appropriated for the purchase of lands to enlarge the military training area located around Guernsey. Newman had a buyer locked in to pay $7.7 million, but that buyer was not able to prepare its offer in final form

or sign on the dotted line until the legislative appropriation process was complete and the budgeted funds actually available at the outset of the 2006–7 biennium (July 1, 2006). So far as the record shows, there were no authentic competing buyers, period. In addition, it is difficult to ignore that Guernsey is a major regional/national, conventional warfare exercise and drill area. Grommet's conduct smacked of unconscionable wartime profiteering that he attempted to disguise as "good business." *Affectio tua nomen imponit operi tuo* (Your motive gives a name to your act). *Black's Law Dictionary* 1817 (9th ed. 2009). The district court was not fooled by Grommet's protestations to the contrary, and neither is this Court. Continuing, Grommet contends that he did nothing more than sell his property for its "fair market value." That phrase means: "The price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." *Black's Law Dictionary* 1691 (9th ed. 2009). The WNG paid $8.5 million under the circumstances presented here because the second broker/appraiser was able to "recalculate" prior appraisals to satisfy the WNG's strict requirement that the price paid not exceed the property's appraised value. We note that an "appraisal" is: "The determination of what constitutes a fair price; valuation; estimation of worth." *Black's Law Dictionary* 117 (9th ed. 2009). An "appraiser" is: "An impartial person who estimates the value of something, such as real estate[.]" *Id.*

[¶ 53] In summary, we are satisfied that the district court's findings that Grommet breached the implied covenant faithfully reflected the evidence adduced at trial.

### Filing of *Lis Pendens* by Newman

[¶ 54] Grommet contends that the filing of a *lis pendens* by Newman, with the intent of blocking the sale of the ranch to the WNG, was a tort. Newman filed the *lis pendens* upon the advice of his attorney. See generally Wyo. Stat. Ann. §§ 1–6–106 through 1–6–109 (LexisNexis 2009) and 51 Am.Jur.2d *Lis Pendens* §§ 1–6 (2000 and Supp. 2009). That filing did not delay the sale of the ranch. In order that it not delay the sale, Grommet agreed to place a sum of money in escrow that was approximately equal to the commission that Newman contended was due him. For the purposes of this litigation, we deem the matter of the *lis pendens* to have been resolved by the parties. Beyond that, it plays no role in the resolution of the issues raised in the pleadings filed in this case.

### Extension Void under Brokerage Disclosure Statute

[¶ 55] Grommet claims that the listing agreement and any extension thereof was void under Wyo. Stat. Ann. § 33–28–306 (LexisNexis 2007) (amended 2009) because his broker's disclosure had not been acknowledged by all sellers (Grommet, his wife and sister). Newman and Grommet had many years of dealing with each other, with Newman acting as a real estate broker and Grommet acting as a buyer, seller or swapper of real property. We agree with the district court that the extension of the listing agreement was valid because the agreement that was extended was valid. Under the circumstances of this case we also take note of what we had to say in *Roney v. B.B.C. Corporation*, 2004 WY 113, ¶ 27, 98 P.3d 196, 204 (Wyo.2004):

> We have expressed on many occasions that public policy does not favor the forfeiture of contract rights. In *Wyoming Realty Co. v. Cook*, 872 P.2d 551, 554 (Wyo. 1994) (quoting *Battlefield, Inc. v. Neely*, 656 P.2d 1154, 1157 (Wyo.1983)), we reiterated:
>
> > Courts do not like to aid litigants in avoiding their contractual obligations by joining in their games of hide-and-seek behind statutory technicalities-especially is this so where the other party has performed and the party looking to avoid the contract has reaped all the benefits of the performance. We will not aid and abet such efforts if we can possibly avoid it.
>
> See also *Gray v. Stratton Real Estate*, 2001 WY 125, ¶¶ 9–10, 36 P.3d 1127 (Wyo. 2001). As in the above-cited cases, we decline to allow Roney to avoid her contractual obligations.

The extended contract between Newman and Grommet was enforceable.

## Newman's Fraud on the Wyoming Real Estate Commission

[¶ 56] Within the context of this case, Grommet claims that Newman defrauded the Wyoming Real Estate Commission when he submitted evidence to that Commission in connection with Grommet's assertion that Newman had violated Wyoming Statutes and the ethics of his profession because he did not obtain Grommet's (or his wife's, or his sister's) signatures on a broker's disclosure form. Grommet claims to have been damaged because Newman's "fraud" on the Commission damaged him when the Commission dismissed Grommet's complaint. Grommet claims the district court furthered that fraud by its findings and he asks that we re-examine the evidence produced at trial and finally do him justice. We have done so and we do justice by holding that Grommet's claims in this regard are not supported by the evidence.

## Newman's Breach of Fiduciary Duties Owed to Grommet

[¶ 57] Grommet contends that Newman was first to breach the contract between them by failing to tell Grommet of offers made on the ranch by other buyers. Grommet asks that these failings be remedied by a forfeiture of any commission due him, as well as paying Grommet's attorney's fees. We have carefully examined the record on appeal and we find no credible evidence in the record to support Grommet's assertions in this regard.

## Attorney's Fees for Grommet

[¶ 58] Grommet contends that he is the party entitled to attorney's fees under the listing agreement. However, as set out more fully herein, we have determined that the district court's findings of fact are fully supported by the evidence adduced at trial and that the district court faithfully applied the correct rules of law to those facts. For these reasons we cannot consider an award of attorney's fees for Grommet.

## Case No. S–08–0149

[¶ 59] In case No. S–08–0149, Newman raises these issues:

A. Should [Newman] have been awarded attorney's fees and costs by the district court?

B. Should [Newman's] sales commission have been based on the actual sales price instead of the basic listing price?

C. Should the word "earn" in a standard listing agreement be synonymous with the terms "procuring cause?"

Grommet restates those issues like this:

A. Did the district court correctly rule that ... Newman was not entitled to recover his attorney's fees?

1. Did the district court correctly rule that attorney's fees were not awardable for [Grommet's] breach of the implied covenant of good faith and fair dealing in their implied contract?

2. Is the parties' fee-shifting provision more narrow and restrictive than the typical "prevailing party" provision?

B. Did the district court err when it failed to award attorney's fees to [Grommet] for [Newman's] breach of his "Exclusive Right to Sell Listing Contract?"

1. Did [Newman] breach his "Exclusive Right to Sell Listing Contract," and the fiduciary duties incorporated into that contract, when he wrongfully filed a *Lis Pendens* against [Grommet's] property to collect his asserted commission and to stop the sale to the [WNG]?

2. [Is Grommet] entitled to an award of attorney's fees under the common law for [Newman's] fraud and/or willful wrong?

C. Did the district court disregard the parties' contract rights and liabilities when it awarded *any* damages to Newman, let alone $537,500?

D. If this Court chooses to issue an advisory opinion that "earn" is synonymous with "procuring cause," was Bob Brockman the primary, proximate, and procuring cause of the $8.5 [million] sale to the [WNG]?

## DISCUSSION

[¶ 60] The district court clarified its initial decision in several ways, including amending the judgment from $585,000.00 to $537,000.00, basing the judgment on the contract's original $7.7 million selling price, rather than the ultimate selling price of $8.5 million. In addition, the district court amended its original decision that "[b]oth parties should bear its own costs and attorneys' fees[,]" to this:

> ... [W]ith respect to the attorney fees, the Court's previous order will remain in effect. An award of attorney fees for a default would be appropriate for failure to comply with any of the written terms of the contract. However, the Court has found that the defendants breached an implied covenant of good faith as opposed to a written term in the contract. Furthermore, the Court would note that the Defendants placed money in escrow subsequent to the Plaintiff filing a *lis pendens*. Thus, as to any default, the parties agreed as to a procedure for resolving the same. Under those circumstances, the Court does not believe that an award of attorney fees is appropriate in this matter.

### Standard of Review

[¶ 61] We review a district court's decision regarding the award of attorney's fees and costs for abuse of discretion. A court abuses its discretion only when it acts in a manner which exceeds the bounds of reason under the circumstances. The burden is placed upon the party who is attacking the trial court's ruling to establish an abuse of discretion. *Shepard v. Beck*, 2007 WY 53, ¶ 14, 154 P.3d 982, 988 (2007).

In Wyoming, we apply the American rule which holds that each party generally is responsible for his own fees and costs. *See, e.g., Rock Springs Land and Timber, Inc. v. Lore*, 2003 WY 100, ¶ 37, 75 P.3d 614, 628 (2003). **A prevailing party, however, is generally entitled to be reimbursed for his attorney's fees and costs when an express contractual authorization exists for such an award.** *Morrison v. Clay*, 2006 WY 161, ¶ 16, 149 P.3d 696, 702 (2006); *Ahearn v. Tri–County Fed.*

*Sav. Bank*, 954 P.2d 1371, 1373 (Wyo. 1998); *DeWitt v. Balben*, 718 P.2d 854, 863 (Wyo.1986). There is a proviso:

> While the general rule is that a valid provision for attorney's fees in a [contract] is as much an obligation of the contract as any part of it, the trial court still has discretion in exercising its equitable control to allow only such sum as it thinks reasonable. A trial court in its discretion may properly disallow attorney's fees altogether on the basis that such recovery would be inequitable.

*Combs v. Walters*, 518 P.2d 1254, 1255 (Wyo.1974) (citing *Graves v. Burch*, 26 Wyo. 192, 200–01, 181 P. 354, 357 (1919)); *Dewey v. Wentland*, 2002 WY 2, ¶ 50, 38 P.3d 402, 420 (2002); *McGuire v. Lowery*, 2 P.3d 527, 533–34 (Wyo.2000). [Emphasis added.]

*Meyer v. Hatto*, 2008 WY 153, ¶ 26, 198 P.3d 552, 557–58 (2008).

[¶ 62] Newman argues that he is contractually entitled to such an award on the basis of language in his agreement with Grommet and that it is clearly a disservice to equitable considerations to disallow him a reasonable attorney's fee under the circumstances of this case. The agreement provides this in that regard:

> A. **TIME IS OF THE ESSENCE** hereof, and any party who fails to tender any payment, or perform any other condition hereof as herein provided, shall be in default of this Contract. In the event of default, the non-defaulting party may elect to either treat this Contract as breached and recover such damages as may be proper, or may treat this Contract as being in full force and effect and require specific performance of the items hereof. In lieu of the remedy provided above to Seller if Buyer is the defaulting party, Seller may elect to terminate the Contract and retain all payments made hereunder as liquidated damages, such among being agreed by the parties hereto to constitute compensation for the loss of opportunity suffered by Seller due to such breach.
>
> B. In the event that any party shall become in default or breach of any of the

terms of this Contract, such defaulting or breaching party shall pay all reasonable attorney's fees and other expenses which the non-breaching or non-defaulting party may incur in enforcing this Contract with or without formal proceedings. This provision shall not limit any other remedies to which the parties may be otherwise be entitled.

[¶ 63]   In *Shepard* we held that:

Therefore, as the prevailing party on the breach of contract claim, the appellant may collect her attorney's fees as provided for by the contract. That fact is not, however, fully dispositive of this issue. The district court order in the instant case merely said that each party should pay his or her own attorney fees. It did not specify whether it did so under the default "American Rule" regarding attorney's fees, (FN4) or whether it recognized that appellant was entitled to fees under the contract, but determined under its equitable powers that each party should pay his or her own. (FN5) On remand, the district court is instructed that the appellant is contractually entitled to attorney fees, but such may be adjusted as appropriate under the federal lodestar test. "The two factors which are examined under the lodestar test are: '(1) whether the fee charged represents the product of reasonable hours times a reasonable rate; and (2) whether other factors of discretionary application should be considered to adjust the fee either upward or downward.'" *Cline*, 998 P.2d at 951 (quoting *Johnston v. Stephenson*, 938 P.2d 861, 862–63 (Wyo.1997)).

(FN4.) Wyoming subscribes to the American rule regarding recovery of attorneys' fees. *Board of County Commissioners of County of Platte v. State ex rel. Yeadon*, 971 P.2d 129, 132 (Wyo.1998). Under the American rule, each party is generally responsible for his own attorneys' fees. 971 P.2d at 132–33. A prevailing party may, however, be reimbursed for his attorneys' fees when express statutory or contractual authorization exists for such an award. *Id. Cline v. Rocky Mountain, Inc.*, 998 P.2d 946, 949 (Wyo.2000).

(FN5.) In *Castleberry v. Phelan*, 2004 WY 151, n. 2, 101 P.3d 460, 464 n. 2 (Wyo.2004), we noted that

[o]ur holding in this case does not depart from prior cases in which we have stated that, "[e]ven in the face of a valid contractual provision for attorney's fees . . . a trial court has the discretion to exercise its equitable control to allow only such sum as is reasonable or the court may properly disallow attorney's fees altogether on the basis that such recovery would be inequitable." *Dewey* [*v. Wentland*, 2002 WY 2], ¶ 50[, 38 P.3d 402, 420 (2002) ]. The district court's decision indicates that its decision was based upon a legal conclusion that attorneys' fees were not available. There is nothing in the decision to indicate that it was denying Castleberry attorneys' fees on the basis of equity. *Id.*

*Shepard*, ¶ 17, 154 P.3d at 990.

[¶ 64]   We conclude that it is unnecessary to substantively address the differences, nuances, or similarities of the terms "earn," "sell or sold," and "procuring cause" in order to resolve this issue. But see generally D. Barlow Burke, Jr., *Law of Real Estate Brokers*, Chapter 5, at 5–1 through 5–82, "The Broker's Commission: The Majority Rule" (3rd ed. 2009). We are comfortable in sustaining the district court's explicit and implicit findings that Newman was the "procuring cause" of the sale of Grommet's ranch. We are also comfortable in concluding that Newman "sold" the ranch and that he "earned" the commission provided for in the governing contract. Furthermore, we are comfortable in concluding that Brockman was not the "procuring cause" of the sale, did not "sell" the ranch, and did not "earn" a commission. Any dispute between Grommet and Brockman over the commission Brockman received is not a matter of concern in this case.

[¶ 65]   We disagree with the district court's finding/conclusion that Grommet only violated the implied covenant of good faith and fair dealing, and not the contract itself. Grommet agreed to pay Newman a commission if he sold the ranch, and sell the ranch he did. Grommet violated the explicit terms of the contract when he refused to pay New-

man his commission once Newman had "sold" the ranch and "earned" the commission. For these reasons we reverse that portion of the judgment which refused to award Newman reasonable attorney's fees. By the terms of the contract, Newman is entitled to a reasonable attorney's fees award. Therefore, we remand the case to the district court for the purpose of assessing what Newman's reasonable attorney's fees award should be.

## CONCLUSION

[¶ 66] The judgment of the district court awarding Newman his commission is affirmed. That part of the district court's judgment which determined that an attorney's fee award would be inequitable under the circumstances of this case is reversed and this matter is remanded to the district court for the purpose of ascertaining what reasonable attorney's fees Newman should be awarded.