2010 WY 71

**William J. COMEAU, a/k/a William Comeau, Appellant (Defendant),**

v.

**Carol NASH, as Personal Representative of the Estate of Kenneth T. McGrath, Appellee (Plaintiff).**

No. S–09–0075.

Supreme Court of Wyoming.

June 1, 2010.

Representing Appellant: Sharon M. Rose of Lavery & Rose, P.C., Evanston, WY.

Representing Appellee: V. Anthony Vehar of Vehar Law Firm, Evanston, WY.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶1] Appellant, William J. Comeau (Comeau), challenges the district court's factual findings and legal conclusions to the effect that Comeau breached a fiduciary duty he owed to Kenneth T. McGrath (McGrath, or Mac). McGrath is deceased and Comeau is one of his heirs. During McGrath's lifetime, Comeau obtained control of McGrath's health care decisions and his financial assets via powers of attorney. Upon McGrath's death, Comeau essentially had possession of all of McGrath's assets via pay-on-death directives, accounts in joint tenancy with right of survivorship, and other means. Comeau maintained that that result was in accordance with McGrath's intentions, which he clearly expressed during the final months of his life. McGrath lived with Comeau and his wife (who was a nurse) in their home, or was in nursing home care near Comeau's home, during the last seven months of his life. In addition to challenging the district court's findings that Comeau breached fiduciary duties owed to McGrath, Comeau challenges the district court's findings that McGrath was susceptible to undue influence and that Comeau exercised actual control and undue influence over McGrath. Appellee, Carol Nash (Nash) is the personal representative of McGrath's estate and she is also one of McGrath's heirs. We will affirm.

### ISSUES

[¶2] Comeau raises these issues:

1. Was the district court's finding that Kenneth T. McGrath was susceptible to undue influence clearly erroneous in light of the testimony of numerous witnesses that McGrath was competent.

2. Was the district court's finding that [Comeau] exercised actual control and undue influence over McGrath clearly erroneous in light of the evidence that

McGrath himself directed [Comeau's] transactions.

3. Whether the district court's finding that [Comeau] breached a fiduciary duty was clearly erroneous.

Nash's statement of the issues tracks those raised by Comeau.

### FACTS AND PROCEEDINGS

[¶3] The principal parties to this litigation are Comeau and Nash. They were once married to each other. Nash is McGrath's granddaughter. Comeau was once, in essence, McGrath's grandson-in-law and not a blood relative to him. Comeau characterized himself as McGrath's "great-grandson's dad—or granddad." Mr. McGrath spent his working career as a banker.

[¶4] Comeau met Mac in 1972, when he came to the Evanston/Layton, Utah, area to meet his new great-grandson, the child of Nash and Comeau. Nash and Comeau divorced long before the events that are pertinent to this appeal. Nonetheless, Comeau remained very close with McGrath and McGrath continued to treat Comeau as if he were one of his grandchildren. Indeed, their friendship deepened after Comeau was divorced from Nash.

[¶5] McGrath's family (including Comeau) thought McGrath lived on a modest pension. For the most part, McGrath went to the Veterans Administration medical facilities in Salt Lake for his medical care. In fact, McGrath owned his home, had over $300,000.00 in checking and savings accounts, and owned a valuable piece of real estate in Florida. Comeau learned of McGrath's considerable wealth after McGrath's health began to fail and after McGrath had moved in with Comeau and his wife (who was a nurse experienced in caring for the elderly). By the time of McGrath's death, Comeau had come into possession of almost all of McGrath's assets, except for the land in Florida. Comeau's possession of the bulk of McGrath's estate did not reflect the testamentary intentions evinced by his Last Will and Testament.

[¶ 6] There is no dispute between the parties as to the steady deterioration of McGrath's health. That process began in early 2005 and became increasingly evident because he had difficulty walking during an annual trip he and Comeau took to Las Vegas in October of 2005, at a time when Mac was nearing his 88th birthday. McGrath did not want to talk to Nash about his "slowing down." However, Comeau got McGrath to agree to see Comeau's family physician, Joel G. Porter, M.D., a family physician in Layton, Utah. McGrath was examined by Dr. Porter on February 6, 2006. This was the first time Dr. Porter had met Mac. Nash was aware of what Comeau was doing with respect to McGrath's health and the health care provider(s) involved. Nash was comfortable with Comeau and his wife taking care of Mac because Comeau's wife was a registered nurse and had been a director of nursing at a nursing home for many years.

[¶ 7] Dr. Porter had an independent recollection of seeing Mac on February 6th, and Porter made lengthy notes about his examination. Dr. Porter diagnosed Mac as "possibly" suffering from "early dementia," but he also noted that observation over time is required to diagnose that condition. Dr. Porter's report indicated that Comeau and his wife were McGrath's grandchildren, but he did not recall if Comeau told him that, or if Mac told him that, or if he just assumed it.

[¶ 8] Mr. McGrath experienced a fall at home in Layton, Utah, on March 6, 2006. Comeau and his wife found him on the floor of his home in a semi-conscious and somewhat incoherent condition. He was unable to get up off the floor without assistance. McGrath was taken to the hospital emergency room by Comeau after the fall. The hospital records indicate that Comeau identified himself there as a "friend" of McGrath. McGrath was treated at the emergency room and released. After that incident, McGrath agreed that he should move to Evanston with the Comeaus, and none of McGrath's "blood" relatives appear to have had any objections to that.

[¶ 9] Comeau took Mac to see Dr. Porter for a second time on March 13, 2006, shortly after the fall. The upshot of the follow-up visit with Dr. Porter was that McGrath was suffering from dehydration (at the time of the fall), and had probably suffered a stroke. He was having more difficulty getting around (a lightweight wheelchair was ordered). Dr. Porter continued Mac on a prescribed medication to treat hypertension (that was prescribed during the hospital visit), and added a second anti-hypertensive medication. Dr. Porter also provided a letter to Comeau, at Comeau's request, to the effect that McGrath "is still able to manage his own funds and financial affairs."

[¶ 10] After the incident described immediately above, McGrath moved to Evanston to live with the Comeaus. That McGrath moved to Evanston, and that he did so voluntarily, and that it was his wish to be there, is not disputed by any evidence in the record. The day following that move, McGrath told the Comeaus that he no longer wanted to have to deal with bill paying and managing his various bank accounts. He also expressed his trust of Comeau, in part on the basis that he was the only one who had never tried to borrow money from him.

[¶ 11] On March 9, 2006, McGrath gave Mr. and Mrs. Comeau a general power of attorney. It was a form downloaded from the Internet and McGrath filled in the blanks. His handwriting is legible (especially his signature), although it does evince the weakness that McGrath was described as experiencing at that time. That document was witnessed by a neighbor who attested that McGrath was "lucid," that she had no "concerns about his competency at all," and that McGrath "appeared to be well aware of what he was doing" in signing the documents.

[¶ 12] After McGrath's second appointment with Dr. Porter on March 13th, he used the light wheelchair if they were going out of the house. He did not use the wheelchair at home. After the second appointment with Dr. Porter, the Comeaus began taking Mac to see Dr. Segarra in Evanston. This change was made because McGrath was going to be living in Evanston, and the Comeaus considered it best that he have a physician in Evanston rather than having to transport

Mr. McGrath to Layton, Utah, for medical care.

[¶ 13] On March 23, 2006, McGrath executed a power of attorney for his medical and healthcare decisions, designating Mr. and Mrs. Comeau as his agent(s) and attorney(s)-in-fact. This power of attorney was never exercised. On April 5, 2006, Dr. Segarra determined that McGrath was incapable of making his own determinations and signing his own authorizations and forms. On May 10, 2006, the district court appointed Comeau as McGrath's Guardian. Mr. McGrath died on October 16, 2006. The report Comeau submitted to the district court as Guardian is included in the record on appeal.

[¶ 14] When it came time to probate McGrath's will, most of McGrath's assets were in Comeau's possession. On April 6, 2007, Nash filed a complaint seeking to recover those assets from Comeau and in favor of McGrath's estate and the heirs named in McGrath's will. Comeau is one of those heirs.

[¶ 15] The assets at issue are these:

*1. Key Bank Certificate of Deposit* $100,000.00

Comeau obtained McGrath's consent to add him as the "pay on death (POD)" beneficiary of this certificate of deposit on March 13, 2006. This was accomplished after the bank refused Comeau's initial attempt, made on March 10, 2006, to use the power of attorney he held to add his name as "joint" owner of the CD. Employees of the bank testified that they were ready to call police because of the disruption Comeau caused on his first visit. When Comeau returned with McGrath in his company, McGrath initially refused to change the CD because it would have meant a partial loss of accumulated interest. The bank employees further testified that Comeau coaxed McGrath by saying he needed to make the change because the money might be needed for McGrath's care. McGrath decided to make the POD change because that did not entail a loss of interest.

*2. American First Credit Union* $141,069.35

Comeau obtained these funds using the general power of attorney given him by McGrath.

*3. Zion's Bank* $ 77,383.87

Comeau obtained these funds using the power of attorney, although a bank officer called McGrath and talked to him on the phone to verify Comeau's authority, and in order to obtain McGrath's approval of the change of the account to a joint account with Comeau.

*4. McGrath's home* $159,131.80

Comeau sold McGrath's house using the power of attorney.

*5. McGrath's car* $ 8,500.00

Comeau used the power of attorney to change the title of this car.

*6. Miscellaneous* $ 1,529.00

Comeau wrote a check to pay for his car insurance ($429.00) using McGrath's checking account, and he deposited a refund check ($1,100.00) owed to McGrath into his own account.

7. In addition, Comeau may have had possession of some of McGrath's personal property at the time the judgment was entered in this case. In addition to the monetary judgment imposed by the district court, it was ordered that Comeau surrender the personal property to Nash.

## DISCUSSION

### Standard of Review

[¶ 16] We review a district court's decision following a bench trial according to the following standards:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Further[more], with regard to the trial court's findings of fact,

[W]e assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

The district court's conclusions of law however are subject to our de novo standard of review.

*Grommet v. Newman,* 2009 WY 150, ¶ 38, 220 P.3d 795, 807 (Wyo.2009) (quoting *Dickson v. Thomas* (*In re Estate of Thomas*), 2009 WY 10, ¶ 6, 199 P.3d 1090, 1093–94 (Wyo.2009)); *Lasen v. Anderson,* 2008 WY 80, ¶ 15, 187 P.3d 857, 860 (Wyo.2008).

[¶ 17] In addition we have held:

This Court may examine all of the properly admissible evidence in the record, but we do not reweigh the evidence. *Forshee, et ux. v. Delaney, et ux.,* 2005 WY 103, ¶ 6, 118 P.3d 445, 448 (Wyo.2005). Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses. We accept the prevailing party's evidence as true and give to that evidence every favorable inference which may fairly and reasonably be drawn from it. *Harber v. Jensen,* 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004) (quoting *Life Care Centers of America, Inc. v. Dexter,* 2003 WY 38, ¶ 7, 65 P.3d 385, 389 (Wyo.2003)). Findings may not be set aside because we would have reached a different result. *Harber,* ¶ 7, 97 P.3d at 60 (citing *Double Eagle Petroleum & Mining Corp. v. Questar Exploration & Production Co.,* 2003 WY 139, ¶ 6, 78 P.3d 679, 681 (Wyo.2003)). A finding will only be set aside if, although there is evidence to support it, this Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006).

*Street v. Street,* 2009 WY 85, ¶ 9, 211 P.3d 495, 498–99 (Wyo.2009) (citing *Snelling v. Roman,* 2007 WY 49, ¶¶ 7–8, 154 P.3d 341, 345 (Wyo.2007)).

[¶ 18] Unlike the *Street* case above (wherein the issue was not directly raised), Nash contended below that Comeau exercised undue influence over McGrath and for that reason we must apply the law pertinent to such a claim. In order to prevail on a claim of undue influence, the following must be proven: 1) opportunity to control; 2) a condition permitting subversion; and 3) activity on the part of the person charged. We have also held that courts should zealously scrutinize deed transactions between people in confidential relationships. If the party challenging the validity of a deed transaction on the basis of undue influence establishes a confidential relationship, the party who received the property has the burden to establish that the transaction was fair and conducted in good faith. *Estate of Short,* 785 P.2d 1167, 1170 (Wyo.1990).

[¶ 19] With the facts of this case particularly in mind, this summary of the applicable law from 25 Am. Jur. 2d *Duress and Undue Influence* § 39 (2004) is especially in point:

The relationship of the parties is a factor to be taken into consideration in determining the existence of undue influence. The absence of a fiduciary relationship is not an absolute bar to an undue influence claim if it can be shown that alleged undue influence has a different basis, such as fraud or coercion. However, under certain circumstances, a presumption of undue influence arises from proof of a confidential or fiduciary relationship.

To support a finding of a fiduciary or confidential relationship, the evidence must show that the parties are not on equal terms, or, in other words, that on the one side there is an overmastering influence, or on the other, there is weakness, dependence, or trust that is justifiably reposed. Any relation of confidence that gives one person domination over the other falls within the category of fiduciary relations.

Factors that may be considered in determining the existence of a confidential relationship include—

- the victim's advanced age, physical or mental debility or weakness, or dependence on the dominant party.

- whether the individuals maintain a close relationship.
- whether there is a power of attorney between individuals.

The Restatement [Contracts 2d § 177] describes a confidential relationship as either one person under the domination of another or one who is justified, by virtue of his relation with another, in assuming the other will not act inconsistently with his or her welfare.

**District Court's Findings and Conclusions**

[¶ 20] The facts as they are stated above are not seriously contested by either party. We will summarize the district court findings that we deem *not to be* clearly erroneous. We will also add a few observations of our own which are implicit, if not explicit, in the district court's findings. McGrath was an experienced banker and, thus, not a neophyte when it came to financial dealings such as those that are the subject of this litigation. McGrath had a close relationship with all of his extended family members who are named in his will as heirs. McGrath had a closer relationship with Comeau and his wife than he did with his "blood" relatives, indeed one witness testified that McGrath thought of Comeau as a "son" and would trust him with anything. Comeau was treated on an equal basis as the "blood" relatives in McGrath's will.

[¶ 21] McGrath kept the nature and amount of his assets to himself and so none of his relatives/heirs were aware of the significant assets that made up McGrath's estate. McGrath's health began to deteriorate in 2005. Comeau found out about McGrath's wealth once he moved in with the Comeaus in March 2006. McGrath lived with the Comeaus in their home for a time and was dependent upon them during that time. After suffering a debilitating stroke, McGrath was moved to a nursing home in the late spring of 2006, where the Comeaus continued to monitor his day-to-day care. He died there on October 16, 2006.

[¶ 22] Within one month of McGrath's death, Comeau had completed the transfer of all of McGrath's bank accounts into his own accounts. McGrath may or may not have made promises to Comeau about giving the bulk of his assets to Comeau, but the only evidence in the record to support such claims by Comeau are his own self-serving testimony and the fact that McGrath gave him a general power of attorney that, theoretically, could support Comeau's claims to the bulk of McGrath's estate. In any event, Comeau used the power of attorney, as well as his persuasion, to obtain "possession" of virtually all of McGrath's assets, including his home and his car.

[¶ 23] Based upon these facts and circumstances, the district court found that McGrath was in a condition that permitted subversion and that a confidential relationship existed between McGrath and Comeau. Because McGrath lived with and was dependent upon the Comeaus, the district court found that they had the opportunity to "control" McGrath. The Comeaus were well aware of McGrath's steadily deteriorating physical and mental abilities, and this circumstance created an opportunity "permitting subversion" by the Comeaus. Based upon these facts and circumstances, the district court found that Comeau exercised undue influence over McGrath and that all of Comeau's actions after March 6, 2006, were "presumed to be the result of this undue influence." Comeau offered no credible evidence that McGrath made, or intended to make, a gift to Comeau of all of his assets. The district court further opined:

39. The facts in this case lead the Court to conclude that Mac trusted Bill and Patty [Comeau] to care for him, to look after him and his property, to dispose of the property as needed and then to see to it that it was distributed according to his will. The use of a power of attorney, the appointment of Bill as guardian, and the informal accounting that Bill gave to Mac after the sale of the house are consistent with a less-than-complete transfer of assets at the outset. The failure to execute any formal writing such as a statement of gift or a revocation of his will indicates a lack of intent to make a gift of the residuary estate to Bill.

40. The facts paint a picture of Bill recognizing that the other members of

Mac's family were unaware of the extent of Mac's estate and he had complete access to it and could take the assets and no one would know. Mac was failing rapidly as early as April of 2006 and Bill and Patty directed that there be no measures to re-suscitate or prolong his life. When Mac was in a state of advanced dementia Bill began transferring money to his own accounts and continued the transfers until soon after Mac's death nothing was left. Bill resisted accounting for Mac's assets in the guardianship, which is inconsistent with the actions of someone who has nothing to hide. In short, the evidence indicates a deliberate plan to take advantage of trust placed by an aged and failing man to get all of his assets.

[¶ 24] The district court then correctly applied the applicable law to determine that the exercise of undue influence need be proven by a preponderance of the evidence. *Matter of Waters' Estate*, 629 P.2d 470, 473 (Wyo. 1981). Furthermore, the district court held that Nash's evidence proved: (1) An opportunity to control; (2) a condition permitting subversion; (3) activity on the part of Comeau; and (4) a benefit to Comeau. *Lasen*, ¶ 18, 187 P.3d at 861. To the extent that Comeau contended that McGrath had made a gift of his assets to him, the district court concluded that Comeau failed to bear his burden of proof. See *Parkhurst v. Boylin*, 2004 WY 90, ¶ 17, 94 P.3d 450, 458 (Wyo. 2004). As McGrath's guardian, as well as the person holding a general power of attorney for the purpose of managing his financial affairs, Comeau was a fiduciary and owed McGrath a duty to act with the utmost good faith. *Snearly v. Hockett*, 352 P.2d 230, 233 (Wyo.1960). Comeau violated that duty.

## CONCLUSION

[¶ 25] The district court's finding that McGrath was susceptible to undue influence was not clearly erroneous. The district court's finding that Comeau exercised actual control and undue influence over McGrath was not clearly erroneous. The district court's conclusion that Comeau breached a fiduciary duty was not clearly erroneous.

The judgment of the district court is affirmed in all respects.