2011 WY 79

Eva D. KELLY and Lee J. Kelly, in their individual capacities, Appellants (Plaintiffs),

v.

Roby L. McNEEL, Successor Trustee, Appellee (Defendant).

In the Matter of the Guardianship and Conservatorship of Robert Lee McNeel, Eva D. Kelly, an individual, Appellant (Guardian),

v.

Roby Lee McNeel, Guardian and Conservator and Trustee of the Robert L. McNeel Living Trust, Appellee (Intervenor).

Nos. S–10–0179, S–10–0190.

Supreme Court of Wyoming.

May 9, 2011.

Representing Appellants in Case No. S–10–0179: Chris Edwards of Simpson, Kepler & Edwards, LLC, the Cody, Wyoming Division of Burg Simpson Eldredge Hersh & Jardine, PC, Cody, Wyoming.

Representing Appellee in Case No. S–10–0179: Henry F. Bailey, Jr. and Lance T. Harmon of Bailey, Stock & Harmon P.C., Cheyenne, Wyoming. Argument by Mr. Bailey.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] Following a bench trial, the district court concluded that Eva D. and Lee J. Kelly (the Kellys) exercised undue influence over Robert Lee McNeel. Accordingly, the district court invalidated the trust and will in which Mr. McNeel had named Mrs. Kelly as one of two beneficiaries in place of his son, Roby McNeel. In a separate proceeding, the district court granted Roby McNeel's motion to remove Mrs. Kelly as Mr. McNeel's guardian and conservator, and appointed Roby McNeel to replace her. The Kellys appealed, claiming the district court's finding of undue influence and removal of Mrs. Kelly as guardian and conservator were clearly erroneous. We affirm.

## ISSUES

[¶ 2] The issues for this Court's determination are whether the district court's finding of undue influence and removal of Mrs. Kelly as Mr. McNeel's guardian and conservator were clearly erroneous.

## FACTS

[¶ 3] Mr. McNeel married Lois Hicks in 1948. At the time of the marriage, Ms. Hicks had two daughters by her deceased first husband, Eva Bronnenberg (Mrs. Kelly), age three, and Roberta Bronnenberg (Mrs. Jenkin), age five. During the marriage, the McNeels had one child together, Mary Kay McNeel (Mrs. Diehl). Mr. and Mrs. McNeel raised the three girls on their ranch in Bondurant, Wyoming. Mrs. McNeel died in June of 1984.

[¶ 4] In January 1985, at the age of fifty-nine, Mr. McNeel married Paula Webb. They had a son, Roby, in 1987. Mr. McNeel's step-daughters did not approve of the marriage; consequently, he had no significant contact with them for many years. In 1991, Mr. McNeel established the Robert L. McNeel Family Trust. His wife and son were the only beneficiaries under the trust.

[¶ 5] In 1998, Mr. McNeel sold the ranch in Bondurant, except for 80 acres that had been homesteaded by Mr. McNeel's first wife's parents (the Hicks property). He purchased a ranch near Big Piney and he and his wife and son moved there. At the time of the trial in this matter, the Big Piney ranch consisted of approximately 4,015 acres of deeded land and 31,000 acres of grazing-permitted land, 420 cattle and two homes.

[¶ 6] Beginning in 1997, when Mr. McNeel was seventy-one, his regular physician, Dr. Michael Menolascino, became concerned that Mr. McNeel might be suffering from organic brain syndrome. Cognitive testing performed at that time revealed at least a mild cognitive impairment. By 2001, Mr. McNeel was taking Aricept, a medication prescribed for Alzheimer's disease. In 2002, Mrs. McNeel expressed concern to Dr. Menolascino about her husband's behavior, providing notes in which she had documented episodes of unusual behavior on his part, including accusing her of infidelities and expressing the belief that Roby was not his son. Dr. Menolascino performed a mental status exam and concluded Mr. McNeel was suffering from progressive Alzheimer's dementia.

[¶ 7] In the winter of 2002–2003, Mr. McNeel's older step-daughter, Mrs. Jenkin, re-established a relationship with her step-father and she and her husband moved back to the ranch to live with Mr. McNeel, his wife and son. In February of 2003, Mr. McNeel, then seventy-eight, filed for divorce. Mrs. McNeel moved out of the home she had shared with him and into the second home located on the ranch. In response to the divorce complaint, she asserted that her husband was not mentally competent to pursue the divorce. Mr. McNeel's attorney retained Dr. Bruce Kahn to evaluate Mr. McNeel and provide an opinion as to his mental competency. In March of 2003, Dr. Kahn diagnosed Mr. McNeel with mild dementia with delusional features. His conclusion that Mr. McNeel was suffering from delusions was based on Mr. McNeel's emphatic belief that Roby was not his biological son despite DNA evidence to the contrary.

[¶ 8] In June of 2003, Mr. McNeel amended the Robert L. McNeel Family Trust to create the Robert McNeel Living Trust in which he disinherited his wife and named his son as his sole beneficiary. Around the same time, the Kellys stopped at the ranch and visited with Mr. McNeel. He told them he needed help with the ranch and, in July of 2003, Mrs. Kelly returned to the ranch permanently. Mr. Kelly continued to live and work in Nevada but returned frequently to help with the ranch work. Shortly after Mrs. Kelly moved in, the McNeels' son, who was then fifteen years old, left his father's home and began staying with his mother or friends.

[¶ 9] In the course of the divorce proceedings, Mr. McNeel agreed to the appointment of a guardian/conservator to help effectuate a property division and ensure the ranch continued to operate as it had in the past. In a separate action, he filed a petition requesting the appointment of Steven D. Olmstead as his guardian and conservator. The district court entered an order appointing Mr. Olmstead in August of 2003.

[¶ 10] In April of 2004, Mr. McNeel met with an attorney to discuss another change to his estate plan. At that time, he contemplated leaving the 80 acre Hicks' property in Bondurant to Mrs. Kelly and Mrs. Jenkin and the remainder of his estate to his son. Mr. Olmstead requested that he wait until the divorce was final and knew what property was his before changing his estate plan. In June of 2004, Mr. McNeel was granted a divorce with the property division left unresolved. A trial was held in October of 2004 to address the property division; however, no decision was rendered at that time.

[¶ 11] In December of 2004, Mr. Kelly moved to the ranch to live with his wife, Mr. McNeel and the Jenkins. On January 2, 2005, the ranch house in which they were living burned down. They rented rooms at an inn in Marbleton, Wyoming where they lived for the next few months. A few days after the fire, Mr. Kelly drove Mr. McNeel to Afton, Wyoming to meet with his attorney to change his 2003 estate plan. At that time, Mr. McNeel told his attorney that he wanted to leave his entire estate in equal shares to Mrs. Kelly and Mrs. Jenkin. A few weeks later, on January 20, 2005, Mr. Kelly called the attorney at Mr. McNeel's request and asked him to change the estate plan from equal shares to leave two-thirds of his estate to Mrs. Kelly and one-third to Mrs. Jenkin. On January 25, 2005, despite Mr. Olmstead's request that he wait, Mr. McNeel signed the trust amendment and will expressly disinheriting his son and leaving two-thirds of his estate to Mrs. Kelly and one-third to Mrs. Jenkin. On February 10, 2005, the district

court entered an order dividing the McNeels' marital property.

[¶ 12] On the night of March 29, 2005, Roby McNeel found his father walking down the road in Marbleton. He stopped and asked his dad what he was doing. Mr. McNeel responded that he was headed to the ranch and intended to stay out there. Despite knowing that the ranch house had burned down and there was no place for his father to stay, Roby offered him a ride to the ranch. After confirming that there was no place for Mr. McNeel to stay, Roby took him back to Big Piney to Dr. David Burnett's office. Dr. Burnett found Mr. McNeel to be extremely agitated and confused and recommended that his son take him to the hospital in Jackson, Wyoming. The hospital physician's assessment was that Mr. McNeel had advanced dementia with very little insight into his condition.

[¶ 13] Mr. McNeel was referred to a psychiatric hospital in Salt Lake City, Utah. He remained there through April when he was discharged into the Kellys' care. In July of 2005, Mrs. Kelly was substituted for Mr. Olmstead as guardian and conservator. Mr. McNeel's condition continued to deteriorate and, after temporarily placing him in a skilled nursing facility in Salt Lake City, the Kellys had him transferred to a secure treatment facility. A few days later, Mrs. Kelly signed a contract for construction of a half million dollar house on the ranch. After the construction was completed, the Kellys lived in the new house, charged expenses to the trust account and paid Mr. Kelly a monthly salary from the trust.

[¶ 14] As Mr. McNeel's guardian and the conservator of his estate, Mrs. Kelly was required to file regular accountings of her administration of the estate for approval by the district court. In 2007, she and Mr. Kelly filed a declaratory judgment action against Roby McNeel.[1] They alleged that Roby McNeel had made claims in the guardianship/conservatorship proceedings that they had exercised undue influence over Mr.

McNeel and that was why he signed the 2005 trust amendment and will disinheriting his son and leaving the entire state to his stepdaughters. The Kellys asked the district court to declare the 2005 trust documents valid.

[¶ 15] Roby McNeel answered the complaint and filed a counterclaim and third party complaint against the Kellys. He asserted the Kellys obtained their interest in the McNeel property by exercising undue influence over Mr. McNeel at a time when he lacked contractual or testamentary capacity. He sought a declaration that the 2005 trust amendment and will were invalid.

[¶ 16] The district court convened a bench trial from January 19 to 23, 2010. In May of 2010, the court issued a judgment and order finding that Roby McNeel did not establish by a preponderance of the evidence that Mr. McNeel lacked testamentary capacity on January 25, 2005, but did establish by clear proof that the Kellys exercised undue influence over Mr. McNeel in executing the 2005 trust amendment and will. The district court held invalid the January 25, 2005, trust amendment and will disinheriting Roby McNeel, leaving in effect the terms of the 2003 Robert L. McNeel Living Trust naming Roby McNeel as sole beneficiary. In the guardian/conservatorship action, the district court entered an order removing Mrs. Kelly and substituting Roby McNeel. The Kellys timely appealed the district court's orders.

## STANDARD OF REVIEW

[¶ 17] Our standards for reviewing a district court judgment following a bench trial are well-established:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge

---

1. In addition to Roby McNeel, the Kellys named as defendants Mary Diehl, Mr. McNeel's daughter from his first marriage, and Delaine Roberts, the successor trustee under the 2003 Robert McNeel Living Trust. Ms. Diehl failed to answer the complaint and the court entered a default as to her. Roby McNeel subsequently replaced Mr. Roberts as successor trustee under the 2003 trust. Also of note, Mrs. Jenkin died in September of 2006.

to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Comeau v. Nash,* 2010 WY 71, ¶ 16, 233 P.3d 572, 575 (Wyo.2010) (citation omitted). We review the district court's conclusions of law *de novo. Id.*

### DISCUSSION

#### 1. *Undue Influence*

[¶ 18] In order to establish that Mr. McNeel's 2005 will and amended trust were executed under the Kellys' undue influence, Roby McNeel had to establish: 1) the relations between the Kellys and Mr. McNeel afforded them an opportunity to control the testamentary act; 2) Mr. McNeel's condition was such as to permit subversion of his freedom of will; 3) there was activity on the part of the Kellys; and 4) the Kellys unduly profited as beneficiaries under the will and trust. *Retz v. Siebrandt,* 2008 WY 44, ¶ 19, 181 P.3d 84, 91 (Wyo.2008). The party contesting a will bears the burden of proving undue influence by presenting evidence clearly demonstrating that the testator's free agency was destroyed and his volition was substituted for that of another. *Melcher v. Benson (In re Estate of McLean),* 2004 WY 126, ¶ 11, 99 P.3d 999, 1004 (Wyo.2004). In Wyoming, a will deliberately made by a person of sound mind will not be lightly set aside. *Id.*

[¶ 19] After four days of trial, the district court concluded Roby McNeel presented evidence clearly demonstrating each of the elements of undue influence. As to the first element, the Kellys' opportunity to control the testamentary act, the district court made the following factual findings:

- When the Kellys visited him in 2003, Mr. McNeel told them he needed help running the ranch. Mrs. Kelly moved to the ranch. Mr. Kelly came to the ranch frequently to help with the work and moved in permanently in December 2004.
- The Kellys became Mr. McNeel's primary caregivers, preparing meals for him, driving him places, washing dishes, cleaning the house, doing chores on the ranch, making phone calls for him and helping him conduct his personal business and legal affairs.
- In October of 2003, Mrs. Kelly called an attorney to replace the attorney who had been representing Mr. McNeel in his divorce.
- Mrs. Kelly was intimately involved in Mr. McNeel's divorce, making almost daily phone calls to his attorney to complain about the actions of Mrs. McNeel and Roby McNeel.
- The Kellys participated in the divorce mediation.
- After the ranch house burned on January 2, 2005, the Kellys moved with Mr. McNeel into the Marbleton Inn.
- Two days after the fire, Mr. Kelly drove Mr. McNeel to meet with his estate planning attorney in Afton, Wyoming, to change his 2003 estate plan, under which Roby McNeel was to inherit the ranch, to leave his entire estate to the Kellys and Mrs. Jenkin. Mr. Kelly sat in on the meeting with Mr. McNeel and his attorney.
- On January 20, 2005, Mr. Kelly called the estate planning attorney and told him that Mr. McNeel wanted to give two-thirds of his entire estate to Mrs. Kelly and one-third to Mrs. Jenkin.
- On January 25, 2005, Mr. Kelly drove Mr. McNeel to Afton to sign the trust amendment and will leaving his estate to the Kellys and Mrs. Jenkin.

[¶ 20] Having examined all of the admissible evidence in the record, we conclude the above findings are not clearly erroneous. Mrs. Kelly testified that when she and her husband came to the ranch in 2003, Mr. McNeel was happy to see her, invited them in and showed them around the ranch. She testified he expressed remorse for not telling his step-daughters more often that he loved them. He told Mrs. Kelly that he had made

a terrible mistake and needed her to stay and help him. Mrs. Kelly responded by moving in with him. She testified that she thought Mr. McNeel "depended on [her] a lot."

[¶ 21] Mr. Kelly testified that he came to the ranch frequently to help with the ranch work. He and Mr. McNeel had long talks about "everything under the sun," including Mr. McNeel's property and assets. They became very well acquainted and Mr. Kelly felt like Mr. McNeel was quite comfortable with him. In the fall of 2004, Mr. McNeel asked Mr. Kelly if he would move to the ranch. Clear evidence supported the district court's conclusion that the Kellys' relationship to Mr. McNeel from the summer of 2003 through January 25, 2005 afforded them the opportunity to control his testamentary act.

[¶ 22] The Kellys contend otherwise and point to the fact that others were directly involved in Mr. McNeel's decisions, including his divorce attorney, his estate planning attorney, his guardian and conservator and a guardian ad litem appointed to represent his son's interests. They also assert Mr. McNeel was a strong willed man who made his own decisions. In examining all of the properly admitted evidence in the record, we have given due consideration to the district court's opportunity to observe the witnesses and weigh their testimony, including the testimony of Mr. McNeel's attorneys and his first guardian and conservator. We are not at liberty to re-weigh the evidence. From the evidence, we are not left with the definite and firm conviction that the district court committed a mistake when it found Roby McNeel proved the first element required for establishing undue influence.

[¶ 23] Addressing the second element necessary for an undue influence claim—whether Mr. McNeel's condition was such as to permit subversion of his freedom of will—the district court made the following factual findings:

- Mr. McNeel began to show signs of being delusional in the late 1990s, including becoming increasingly angry and paranoid, accusing his son of stealing ranch equipment when it could not be found, losing his temper, acting strangely, becoming disoriented and failing to recognize family friends.

- Dr. Michael Menolascino diagnosed Mr. McNeel with dementia in June 1998.

- In 2001, Mr. McNeel began taking Aricept, a medication designed to delay the onset of symptoms caused by Alzheimer's disease.

- In October of 2001, Dr. David Burnett believed Mr. McNeel was suffering from Alzheimer's dementia and depression.

- Dr. Robert Satovick performed a CT scan in June of 2002 that revealed generalized cerebral atrophy and other age related changes that he felt might be early Alzheimer's.

- In April of 2003, Dr. Bruce Kahn believed Mr. McNeel was suffering from delusional and paranoid thoughts and diagnosed him with Alzheimer's dementia.

- Alzheimer's disease is a progressive, relentless neurological disorder that begins with memory loss and leads to deterioration of intellectual functions, personality changes, and speech and language problems. In the advanced stages, patients may suffer from hallucinations, delusions, paranoia and depression. The general downward trajectory cannot be altered.

- Convinced that his wife was stealing money and being unfaithful, Mr. McNeel filed for a divorce. After Mrs. McNeel contested the divorce, claiming Mr. McNeel was not mentally competent, the court appointed a guardian and conservator to conduct Mr. McNeel's legal affairs.

- In June of 2003, Mr. McNeel amended his trust, disinheriting his wife and leaving his entire estate to his son. In August of 2003, when his son came to get his things, Mr. McNeel told him if he left to never come back. In January of 2005, Mr. McNeel again amended his trust, disinheriting his son and leaving his estate to his two step-daughters.

- Two months after Mr. McNeel amended his trust to disinherit his son, Roby McNeel found him on the street in Marbleton having left the Inn, saying he was going to the ranch where he intended to

stay. Roby McNeel took him to the ranch although he knew there was no place for his father to stay. He then took him to Dr. Burnett who told Mr. McNeel he would need to be institutionalized.

These findings are fully supported by the record.

[¶ 24] Based upon its factual findings, the district court concluded that Alzheimer's disease rendered Mr. McNeel susceptible to undue influence. The district court stated:

In his later years, Bob McNeel suffered from paranoid and delusional thoughts, from believing his son was stealing from him to believing Roby was not actually his own son despite a long and loving relationship as well as DNA evidence that proved otherwise. To the extent Alzheimer's disease weakened Bob McNeel's mind, it empowered those around him to an equal degree to either alleviate or facilitate his paranoia and delusions, depending on their own situations and self-interest. It is clear that Bob McNeel's condition permitted the subversion of his freedom of will, satisfying the second element of undue influence....

[¶ 25] This finding is supported by the district court's findings as well as other evidence in the record, including evidence from which it could be inferred that Mr. McNeel lacked the capacity to testify significantly in his own divorce trial. At the divorce trial, his responses to his attorney's questions were limited to his testimony that, yes, he could hear; yes, he had filed a petition for divorce; and, no, he did not think he could work anything out with Mrs. McNeel. On cross examination, he testified that he believed Mrs. McNeel had taken or lost a million and a half dollars belonging to the ranch, he knew who George Thompson[2] was and his son's name was Roby. Mr. McNeel did not testify at all during the property division trial; his guardian/conservator testified in his stead. During the undue influence trial, Mr. McNeel's divorce attorney testified he did not believe he had ever been involved in another divorce trial in which his client did not testify concerning his or her property.

This evidence provides further support for the district court's finding that Mr. McNeel's condition left him susceptible to subversion of his will.

[¶ 26] The Kellys assert there was evidence from his attorneys and others that Mr. McNeel made his own decisions; knew Roby was his biological son; was fully aware of the value of his ranch; and was otherwise cognitively aware. There is no question that several witnesses who had dealings with Mr. McNeel in the 2003 to 2005 time frame believed he was mentally competent. However, several witnesses who had known Mr. McNeel for much longer testified that he was not himself during those years. Considering the testimony of those witnesses together with the medical evidence showing that Mr. McNeel suffered from Alzheimer's disease and his symptoms were progressively worsening, and giving due regard to the district court's opportunity to weigh witness credibility, we are not convinced the district court was mistaken in concluding Mr. McNeel's condition made him susceptible to influence.

■ [¶ 27] The district court also found that Roby McNeel clearly established there was activity on the Kellys' part, the third element required to prove undue influence. The district court found that after eighteen years with virtually no contact, Mrs. Kelly moved into her step-father's home when he was seventy-eight years old, already suffering from dementia, involved in a difficult divorce and asking for her help. The district court further found that after moving in with their step-father, Mrs. Kelly and her sister did little to make his son feel comfortable living in the home. To Roby, the district court found, it seemed the sisters were watching him and eaves-dropping on his conversations. These circumstances caused Roby to leave his father's home and stay with friends or his mother which in turn angered Mr. McNeel and turned him away from his son. At the same time, the Kellys were becoming more and more involved in Mr. McNeel's divorce and testamentary activities—personally contacting his attorneys

2. Mr. Thompson performed an audit of Mr. McNeel's property and testified in the later property division trial that the audit did not show a million and a half dollar loss.

to relay information not only about his testamentary wishes but also to complain almost daily about the activities of his wife and son, accompanying him to meetings with his attorneys, and appearing at the divorce proceedings.

[¶ 28] Undue influence is seldom susceptible of direct proof and may be established by proof of facts from which it may be fairly and reasonably inferred. *Brosius v. Gardner,* 683 P.2d 663, 667 (Wyo. 1984). The fact that a testamentary act is unnatural, unreasonable or unjust is a circumstance to be considered along with other evidence bearing on the question whether it is the result of undue influence. *Waters v. Holkan,* 629 P.2d 470, 472–73 (Wyo.1981).

[¶ 29] In addition to the evidence described in the foregoing paragraphs, the district court found that prior to developing dementia Mr. McNeel doted on his son, taught him all that he knew about ranching and intended for him to inherit the ranch. In fact, the estate plan in existence before Mr. Kelly took Mr. McNeel to meet his attorney on January 4, 2005, devised everything to his son. Given the evidence showing that Mr. McNeel and his son had been inseparable during Roby's childhood, a fair inference could be drawn that Mr. McNeel's act of disinheriting him after the Kellys moved in was an unnatural circumstance to be considered along with the other evidence.

[¶ 30] Of additional relevance to the issue of the Kellys' actions was evidence that Mrs. Kelly believed Mr. McNeel was having an affair with Paula while her mother, his wife, was dying of cancer. There was evidence Mrs. Kelly was "disgusted" by Mr. McNeel's relationship with Paula and thought he was "rotten." Mrs. Kelly admitted she attempted to prevent Mr. McNeel from marrying Paula by telling him that she was having affairs with other men. From this evidence it could be inferred that when Mrs. Kelly reappeared in her father's life after her long absence she was motivated to redress what she saw as his shameful treatment of her mother. It might also be inferred that Mrs. Kelly's statements to Mr. McNeel concerning Paula's infidelity created the seed for his delusion that Roby was not his son. From the entire record, we

cannot conclude the district court's finding concerning element three of undue influence was clearly erroneous.

[¶ 31] Addressing the fourth element, the district court found:

- On January 25, 2005, Mr. McNeel signed the will and trust amendment disinheriting his son and leaving two-thirds of his estate to the Kellys.
- On September 30, 2005, after committing Mr. McNeel to the secured treatment facility in Utah, Mrs. Kelly signed a contract for the construction of a half a million dollar home on the ranch despite the availability of the house where Mrs. McNeel had lived toward the end of her marriage to Mr. McNeel.
- To finance the new home construction, Mrs. Kelly used $230,000 from the McNeel trust account, took out a line of credit and obtained a mortgage against the ranch.
- When construction was completed, the Kellys lived in the new house. They did not pay rent and charged their living expenses plus travel and entertainment expenses to the trust account. Mr. Kelly received a salary between $2,163.33 and $2,553.21 per month, also paid out of the trust.
- The Robert L. McNeel trust is on the brink of foreclosure, needing to satisfy nearly $1 million of debt with little to no revenue.

[¶ 32] Based upon these findings, the district court concluded:

Following the execution of the Trust Amendment and Will on January 25, 2005, the Kellys stood to inherit a multi-million dollar cattle ranch, with over 4,000 deeded acres in Western Wyoming, while less than a year and half earlier they had been estranged from Bob McNeel and had been specifically excluded from inheriting his estate. The Kellys also benefited in their role as trustees of Bob McNeel's trust, building a half million dollar home on his ranch with his funds and living there rent-free for the last five years, charging meals, travel and entertainment to the Trust account.

As with the other elements of undue influence, the record fully supports the district court's findings on the fourth element. Thus, its order invalidating the 2005 trust amendment and will was appropriate.

### 2. *Removal of Mrs. Kelly as Guardian and Conservator*

 [¶ 33] The Kellys contend there was no basis for removing Mrs. Kelly as guardian and conservator because she breached no legal duty as evidenced by the fact that the expenditures she made on behalf of Mr. McNeel and the trust were approved by the district court. Wyo. Stat. Ann. § 3–3–1101(a)(iv) (LexisNexis 2009) provides in relevant part:

(a) A guardianship shall cease, and a conservatorship shall terminate, upon the occurrence of any of the following circumstances:

. . . .

(iv) A determination by the court that the guardian or conservator is not acting in the best interest of the ward. In such case, the court shall appoint another guardian or conservator[.]

[¶ 34] Pursuant to this statutory provision, the district court had the authority to remove Mrs. Kelly upon determining that she was not acting in Mr. McNeel's best interest. In its order removing Mrs. Kelly, the district court expressly found that she was not acting in his best interest. The court incorporated by reference the findings and conclusions contained in its order and judgment after trial of the undue influence claim. We have concluded those findings are not clearly erroneous. Neither the findings, nor the evidence supporting them, were known when the district court approved Mrs. Kelly's expenditures. Once they came to light in the context of the undue influence trial, the district court properly considered them and relied upon them in removing Mrs. Kelly and appointing Roby McNeel as Mr. McNeel's guardian and conservator.

[¶ 35] We affirm the district court's judgment and orders.